LINDA TABER *et al.*, Plaintiffs-Appellants, *v.* FORREST H. RIORDAN, III, M. D., Defendant-Appellee.

Second District   No. 79-32

Opinion filed May 2, 1980.—Rehearing denied June 2, 1980.

Jack R. Cook, of Cook Law Offices, of Loves Park, for appellants.

Clifford A. Pedderson, of Pedderson, Menzimer, Conde, Stoner & Killoren, of Rockford, for appellee.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

The plaintiff, Linda Taber[1], appeals from a judgment entered on a jury verdict in favor of the defendant, Forrest H. Riordan III, M.D., in a medical malpractice suit. The defendant cross-appeals, claiming that plaintiff's claim was barred by the statute of limitations.

Linda Taber was born with congenitally dislocated hips. When she was 10 years of age both of her hips were operated upon at the Shriners' Crippled Childrens Hospital, where the shelves of the hips were built up with bone from other parts of her body. She was an in-patient for six months and after discharge an out-patient for two years. The right hip bone broke down causing plaintiff considerable pain for a period of two years before she sought out the defendant, who operated upon her on August 12, 1970, and performed what is known as a cup arthroplasty. There was evidence that the femoral nerve in plaintiff's right leg was injured during surgery. However, the plaintiff agrees, and the record supports the conclusion, that defendant did not depart from community standards and used due care in performing the operation.

Immediately after the surgery the plaintiff told defendant that she noticed certain things about her right leg and that it appeared to be

---

[1] Her husband, Edward Taber, who claimed loss of consortium, also appeals. However, for convenience, reference will be made to the single plaintiff throughout.

shrinking. The defendant knew that the femoral nerve was not functioning. He noted in his record that in September 1970 she could not lift her leg; in October 1970 that the leg had no feeling, and in March 1971 that there was atrophy. He first thought it was shock reaction, but when it did not improve he sent her for nerve evaluation tests in December of 1970. He received a report that there was a total denervation of the muscles controlled by the femoral nerve. Repeat studies done in January 1972 were to the same effect. During this period of time, defendant directed the plaintiff to do muscle exercise and muscle stimulation.

The plaintiff remained under defendant's care until August 14, 1972, at which time he told her he could do nothing further for her and sent her to a neurosurgeon. The neurosurgeon testified at trial that plaintiff had a total and complete lack of femoral nerve function, that the surgery was the cause of the problem, that the condition was permanent, and that it was too late for corrective treatment.

The suit was filed on September 27, 1973. Count I charged negligence and contained allegations that plaintiff was informed by defendant that hospitalization and consultation were not required and that defendant had concealed from plaintiff the medical reason for her post-operative condition. Count II alleged that plaintiff had contracted with the defendant to cure her and that there was a breach of contract. Count III alleged uninformed consent, which plaintiff later withdrew. Count IV sought to allege the doctrine of *res ipsa loquitur*. Count V alleged an action for loss of consortium on behalf of the husband based on negligence and count VI sought to base the action for consortium on the doctrine of *res ipsa loquitur*. On motion of the defendant prior to trial the court struck counts II, IV and VI. The case went to trial on the remaining counts.

At trial, medical testimony was in substantial agreement that if a nerve has been degenerated for more than a year, the condition probably would be permanent. Dr. Hageman, called by the defendant, testified in answer to a hypothetical question. He stated on cross-examination that if the repair can be done early there is a better chance of getting results. He said that if there were no return of function in four to six months he would strongly encourage exploration of the nerve and personally would have sought consultation at that point or discussed it with the patient. He noted that all doctors would not agree. He could not testify as to what the community standard was. The doctor stated that if a patient refused to have exploratory surgery, the surgeon would not be in violation of any duty.

The plaintiff testified that defendant did not tell her about the injury to her nerve or the cause of her condition. That when she asked he told her he did not have any idea what was wrong and could not understand

what happened but that these matters took time and it was going to come back or it wasn't. She further testified that the defendant did not suggest or send her to a specialist except for tests until the defendant scheduled an appointment with a neurologist in August of 1972. She said she could not understand why she was being sent there and thought a neurologist had something to do with her head.

Defendant testified that he told plaintiff on several occasions that it would be a good idea to have a neurosurgeon look at her. He felt that she did not understand what he told her.

Plaintiff sought to prove through Dr. Vincent, an orthopedic surgeon, the standard of care defendant was required to meet. In answer to a hypothetical question stating all the facts and circumstances, the doctor was of the opinion that "after the surgery there was an unacceptable and an unexplained and a complication following the surgery resulted in femoral palsy." On cross-examination Dr. Vincent testified that the operative procedure was in accordance with the acceptable standard for competent, capable orthopedic surgeons; and that he didn't know what was done to cause the palsy; that he could not say what was not acceptable except that something happened to the femoral nerve at the time of the surgery. The doctor further stated that he was not saying that the hypothetical surgeon was negligent, that he was not saying anything about negligence, simply that there was a femoral nerve palsy which occurred as result of the surgery. Doctor Vincent further testified that there are some complications in these cases which cannot be explained and that this is one of those cases. And he further testified that it was not unusual for the defendant not to anticipate any nerve injury; that the injury could have happened without any negligence.

Plaintiff primarily contends that the court erred in striking her allegations addressed to defendant's post-operative conduct, in striking the count charging breach of contract and the counts based upon *res ipsa loquitur*. She argues that the doctor had a duty to inform his patient of post-operative complications and to refer her to a specialist based purely upon a fiduciary relationship without regard to proof of customary standards of care. And that, in any event, the *res ipsa loquitur* would excuse the lack of expert medical testimony as to community standards of care.

■■■ We first address the threshold question posed by defendant's cross-appeal, the issue of the statute of limitations. Defendant contends that the plaintiff was aware of her injury almost immediately after the surgery and consequently that her failure to file an action within two years of the surgery would terminate her right to bring the action. (Ill. Rev. Stat. 1969, ch. 83, par. 15). There is dispute in the testimony as to whether plaintiff was informed of her nerve injury by the defendant subsequent to the

operation. Plaintiff contends she did not learn of the alleged negligence of the defendant until August 14, 1972, when she was examined by the neurosurgeon. However, it is clear that plaintiff continued to be treated by defendant until 1972. The plaintiff might reasonably have believed that her difficulty resulted from a post-operative condition rather than a separate injury. A cause of action accrues when the person injured learns of his injury or should reasonably have learned of it. (See *Lipsey v. Michael Reese Hospital* (1970), 46 Ill. 2d 32, 40). Thus the statute begins to run when there is a concurrence of the actual or constructive knowledge of both the physical problem and the possibility that someone is at fault for its existence. (See *Fure v. Sherman Hospital* (1978), 64 Ill. App. 3d 259, 266-67.) This court has noted that "it is knowledge of the *negligent cause* of the injury which is controlling." (*Cutsinger v. Cullinan* (1979), 72 Ill. App. 3d 527, 530.) We conclude that plaintiff brought her suit within two years from the time she learned of the possibility that fault might be assessed for her injury, thus within the limitation period.

Defendant has also argued that the complaint failed to plead adequate facts to show that the action was brought within the statutory period. From our examination of the record we do not agree. We therefore conclude that the trial court properly denied plaintiff's motion to dismiss based on the statute of limitations.

We then address plaintiff's contention that the court erred in refusing to allow the issue of post-operative care to go to the jury based on her claim that the defendant never told her of her injury. She first argues that there is a fiduciary relationship between the doctor and his patient under which a duty arose as a matter of law for the doctor to advise and to not withhold the information that the plaintiff had received an injury during surgery; and that breach of this duty is actionable without medical testimony to establish the community standards of post-operative care owed by a physician.

■ There can be little dispute that a doctor occupies a position of trust and confidence, a fiduciary relationship with his patient. (*Fure v. Sherman Hospital* (1978), 64 Ill. App. 3d 259, 263. See also *Cannell v. Medical & Surgical Clinic, S.C.* (1974), 21 Ill. App. 3d 383, 385.) However, it does not follow that a patient is thereby excused from proving the breach of that duty in a suit against the doctor with evidence that the conduct of the doctor failed to measure up to the applicable standard of care in medical malpractice cases. This standard has long been held not to be the highest degree of skill that one learned in the profession may acquire, "but reasonable skill such as physicians in good practice ordinarily use and would bring to a similar case in that locality." (*Schireson v. Walsh* (1933), 354 Ill. 40, 57.) "[A] defendant doctor is bound to exercise such care and

diligence as a good practitioner practicing in a same or similar community or hospital." (*Borowski v. Von Solbrig* (1973), 14 Ill. App. 3d 672, 678, *aff'd* (1975), 60 Ill. 2d 418.) Similarly, in undertaking surgery or a course of treatment a doctor is held to a standard of disclosure of risks, but is not required to disclose "every conceivable risk which possibly could develop." (*Miceikis v. Field* (1976), 37 Ill. App. 3d 763, 768.) The special relationship which a doctor has with his patient "not only vests the doctor with the responsibility of disclosure, but also requires the doctor to exercise discretion in prudently disclosing information in accordance with his patient's best interests." (37 Ill. App. 3d 763, 768.) The standard of disclosure must be established through expert medical testimony just as such testimony is required on review of the correctness of the handling of cases involving surgery or treatment unless the matters involved are common knowledge or within the experience of laymen. *Green v. Hussey* (1970), 127 Ill. App. 2d 174, 184. See also *Miceikis v. Field* (1976), 37 Ill. App. 3d 763, 769-70 (1976).

■ The duty to inform of possible complications before an operation or course of treatment can be analogized to the duty to inform the patient afterwards of complications that have arisen. The same considerations of doctor-patient relationship are applicable. These include the ability of the plaintiff to understand complicated medical problems, psychological considerations as to the best interests of the patient, the extent of the doctor's own knowledge, and other factors which might affect not only the extent but also the timing of the information. These considerations also argue for the requirement that the duty of disclosure must be measured against applicable medical standards of disclosure in the professional community.

■ The next argument of plaintiff is premised on her testimony that she did not understand the purpose and function of the neurosurgeon to whom she was referred by the defendant. From that she argues that it is common knowledge and that no medical testimony is required for the jury to determine that the defendant should have made it clear to her that she was being referred to a specialist for post-operative care when complications arose. Plaintiff's reliance on the "common knowledge exception" to the general rule requiring expert testimony is misplaced. The exception is rarely applied and strictly limited to its facts. (See *Stevenson v. Nauton* (1979), 71 Ill. App. 3d 831, 837; *Graham v. St. Luke's Hospital* (1964), 46 Ill. App. 2d 147, 158.) This rule has been applied in cases involving anesthesia, tonsillectomy, X rays, and in some cases injections. (46 Ill. App. 2d 147, 158.) However, cases have indicated that post-operative procedures, including the need to refer, are not within the layman's knowledge. (*Crawford v. Anagnostopoulos* (1979), 69 Ill. App.

3d 954, 960-61; *Comte v. O'Neil* (1970), 125 Ill. App. 2d 450, 454.) In *Graham* and *Comte*, it was held that expert testimony was required to establish the standards for failure to refer a patient. Particularly in the circumstances of this case, the question of when to seek outside consultation and what procedures are to be used to correct complications are complex questions which are not within the common knowledge exception. The operation here involved, a cup arthroplasty, is a complicated procedure in which a layman would not be in an adequate position to assess whether the duty resulting after the complications arose was breached. See *Chiero v. Chicago Osteopathic Hospital* (1979), 74 Ill. App. 3d 166, 173.

The record bears out the lack of proof of a cause of action even if medical testimony were not required. First, the evidence indicated that the doctor did tell plaintiff of her injury. By plaintiff's own testimony the doctor told her that "these things take time and that he couldn't understand what had happened." These statements are completely consistent with the doctor's testimony that he had not discovered the cause of the nerve injury and was pursuing a conservative course of treatment.

■■■ We also conclude that the trial court properly dismissed count II of plaintiff's third amended complaint regarding breach of contract for failure to state a cause of action. A common law contract remedy may be available to a patient in a malpractice action. (*Zostautas v. St. Anthony De Padua Hosp.* (1961), 23 Ill.2d 326, 329.) However, in view of the particular relationship between a physician and his patient the application of ordinary rules dealing with mercantile contracts are not justified. (*Gault v. Sideman* (1963), 42 Ill. App. 2d 96, 109-10.) Count II of the complaint was clearly insufficient to establish the contract to cure the plaintiff or to warrant that there would be no untold results from the surgery.

■ We further conclude that the trial court properly dismissed counts IV and VI of the complaint for failure to state a cause of action based on *res ipsa loquitur*. While the doctrine of *res ipsa loquitur* is applicable in medical malpractice cases (see *Edgar County Bank & Trust Co. v. Paris Hospital* (1974), 57 Ill.2d 298, 305), the trial court did not err in ruling that as a matter of law it did not apply under the pleadings in this case. "In determining whether the doctrine is applicable the circuit court is required to decide as a matter of law whether 'the occurrence is such as in the ordinary course of things would not have happened' if the party exercising control or management had exercised proper care." (*Walker v. Rumer* (1978), 72 Ill.2d 495, 502.) The trial court could reasonably conclude that the doctrine would not apply as a matter of law, as the plaintiff's medical history included a congenital hip defect and pain in her hip during several periods during her life. In any event, medical testimony clearly showed that the complications involving the femoral

nerve could arise absent any negligence on the part of the operating physician.

We therefore affirm the judgment.

Affirmed.

VAN DEUSEN and UNVERZAGT, JJ., concur.