MARTHA B. SHEAHAN, Plaintiff-Appellant, v. DONALD H. DEXTER, Defendant-Appellee.

Third District   No. 3—84—0437

Opinion filed August 30, 1985.

Ronald C. Tenold, of Standard & Tenold, of Monmouth, for appellant.

· Burrel Barash, of Barash, Stoerzbach & Henson, of Galesburg, for appellee.

JUSTICE BARRY delivered the opinion of the court:

This appeal by plaintiff Martha Sheahan is from a verdict and judgment in favor of defendant Dr. Donald Dexter in a medical malpractice suit arising out of the paralysis of her right vocal cord following a thyroidectomy performed by defendant on August 28, 1978, at McDonough District Hospital, Macomb.

The events leading up to plaintiff's surgery are not in dispute.

During a routine physical examination by Dr. Timothy Kling, a lump was discovered in plaintiff's neck which was determined to be a nodule on the right lobe of her thyroid gland. Tests disclosed that the nodule was "cold," *i.e.*, one which does not pick up as much radioactive material as does the rest of the thyroid gland during a thyroid scan test. The possibility of malignancy in a cold nodule is between 9% and 35%. As a young woman, plaintiff worked in a plant where she was exposed to radiation. Because of the risk of cancer, the pathologists who performed the tests for Dr. Kling recommended surgical removal of the nodule, and Dr. Kling gave plaintiff a choice of surgeons available at McDonough District Hospital. She selected defendant because he had previously performed some unrelated surgery on her.

Defendant saw plaintiff on August 4, 1978. He prescribed a synthetic thyroid hormone to see if the tumor would shrink without surgery—a treatment which usually takes several months. She returned two weeks later and indicated to defendant that she did not like taking the thyroid hormone. She stated that, since she might take it for three months and then have to have surgery anyway, she preferred having the surgery done at once before the fall semester began at Western Illinois University where she was employed.

The surgery was performed by defendant, assisted by Dr. Kling, on August 28, 1978. Before the surgery, defendant explained to plaintiff that there are delicate structures in the neck which must be avoided, but he did not specifically inform her of any risk of damage to the recurrent laryngeal nerve or of injury affecting her voice. The night before surgery plaintiff signed a general consent to the surgery on a form provided by the hospital. According to both defendant and Dr. Kling, the surgery was uneventful. Defendant identified the recurrent laryngeal nerve, which is located behind the thyroid gland, and he protected the nerve by moving it to the side with a retractor where it was held during the rest of the operation. The nodule was benign.

Plaintiff had some difficulties during the evening of the day of surgery, and she threatened to go home if she did not get better nursing care. Apparently she had trouble with an intravenous needle, and she had some breathing and swallowing problems. Defendant saw her about 9:30 p.m., at which time he ordered an antihistamine to dry up the secretions that were causing the latter difficulties. He was able to calm her down, and the remainder of her postoperative hospitalization was routine.

Defendant again saw plaintiff at his office 10 days after surgery

and at monthly intervals after that. During that time, plaintiff continuously complained of hoarseness, trouble swallowing, "wheezing" during physical exertion, inability to cough, and emotional disturbance. On December 11, 1978, defendant performed a laryngoscopy in order to examine her vocal cords, which appeared to him to be in satisfactory condition. In February plaintiff informed defendant that a professor at Western Illinois University had recommended that she be examined by Dr. G. H. Gehrich, an otolaryngologist in Quincy. Defendant made an appointment for plaintiff with Dr. Gehrich and sent him a letter describing plaintiff's medical history along with her surgical records. Defendant mentioned in the letter that plaintiff had gained a lot of weight since the surgery, that hoarseness after surgery did not seem unusual for a heavy smoker following endotrachael anesthetic, and that there might be possible impairment of the *left* vocal cord, while noting that the thyroidectomy had involved the *right* lobe of the thyroid gland. Dr. Gehrich examined plaintiff and wrote to defendant, reporting that he had found a paralysis of the *right* vocal cord.

After this diagnosis, plaintiff did not return to defendant's care, but was referred by Dr. Kling to a specialist at the University of Iowa hospitals, Dr. William Panje, who confirmed Dr. Gehrich's diagnosis. Dr. Panje treated plaintiff by means of two teflon injections into the area of the vocal cords, and she has regained about 75% to 85% of her normal voice as a result of this treatment. Dr. Panje also referred plaintiff to a psychiatrist, who diagnosed plaintiff as suffering from a post-traumatic stress disorder for which he prescribed an antidepressant medication.

When plaintiff attempted to return to her duties at Western Illinois University following the surgery, she found that she was unable to teach because her voice was not strong enough. She was not offered employment at Western the next year.

In this malpractice action, plaintiff alleged, *inter alia*, that the performance of the thyroidectomy was the proximate cause of the injury to her vocal cords, that defendant negligently performed the surgery, that the surgery was unnecessary, that he failed to warn and inform her of the risks related to a thyroidectomy, that he did not comply with the rules of the hospital concerning informed consent prior to surgery, that he failed to render proper postoperative care, and that he failed to call in consultants.

This case was tried before a jury in the circuit court of McDonough County in February of 1984. At the conclusion of plaintiff's evidence, the court granted part of a motion by defendant to withdraw certain counts of the complaint from the jury, and as a result,

the counts charging defendant with performing unnecessary surgery and with certain preoperative negligences were withdrawn.

In the course of the trial, the jury heard extensive medical testimony from defendant and the other treating physicians, as well as from expert witnesses who testified to the standard of care used in 1978. Plaintiff also testified, as did others in her behalf who described the difference in her voice quality before and after surgery. Plaintiff sought to admit into evidence a video tape made at Western prior to the surgery, in 1977, in which she talked with her grandson and an audio tape of her voice made after surgery, but the trial court refused to allow the tapes to be played for the jury.

On appeal, plaintiff asserts that she is entitled to a new trial because of the following errors: (1) that the verdict in favor of defendant was contrary to the manifest weight of the evidence; (2) that it was error to exclude the video and audio tapes; (3) that it was error to permit testimony by two expert witnesses not previously disclosed; (4) that the trial court refused to give a proper jury instruction on informed consent; (5) that the court erred in allowing defendant to call Dr. Kling as a witness out of order; and (6) that plaintiff was denied her right to poll the jury. We affirm the judgment.

■■ Plaintiff's contention that the verdict in favor of defendant was contrary to the manifest weight of the evidence is a two-pronged argument involving, first, defendant's alleged negligence in failing to obtain plaintiff's informed consent before surgery, and second, his alleged negligence during postoperative treatment in failing to refer plaintiff to a specialist. As plaintiff points out, the standard for allowing a motion for a new trial requires less conclusive evidence than does a motion for a directed verdict. The Illinois Supreme Court held in *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310, 356 N.E.2d 32, 36, as follows:

> "On a motion for a new trial a court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence."

■■ Plaintiff argues that defendant's own testimony and the admissions contained in his answer to the complaint established that he was subject to a standard of care requiring him to inform plaintiff of the risk of injury to the recurrent laryngeal nerve which controls the right vocal cord and that it was undisputed that defendant breached the standard of care. These arguments are not supported by the record.

Defendant admitted only that he had a duty to obtain an informed consent from a patient prior to surgery, and he denied that he had

failed to do so in this case. The doctors who testified disagreed as to whether the standard of care commonly exercised by other surgeons in the locality was violated when plaintiff was not informed of the specific risk of injury to the recurrent laryngeal nerve. The expert witnesses did agree that the risk of injury to the nerve was no greater than 1% or 2% in the performance of a thyroidectomy where the surgeon identifies and protects the nerve before undertaking to remove the gland.

Plaintiff's expert witnesses stated that this was a material risk which should be explained to the patient prior to surgery in order for the patient's consent to be informed. Defendant's experts, on the other hand, agreed with defendant that the risk was so minimal as not to require specific warnings before obtaining the patient's consent to surgery. One doctor testifying on defendant's behalf stated that it would be detrimental to terrify the patient with disclosures of every possibility of injury.

One of plaintiff's expert witnesses, a doctor from Des Moines, Iowa, testified that he would have performed a fine needle biopsy before proceeding with the thyroidectomy and that he had performed such procedures in 1978. The doctors testifying for defendant stated that fine needle biopsies were not performed in Macomb or any surrounding area (including Burlington, Iowa, and Peoria, Illinois) in 1978, and in fact, fine needle biopsies had not been heard of in Macomb in 1978. One witness stated that such tests were first described in medical literature in 1980-81 and were first performed in Macomb in 1981. Plaintiff offered no rebuttal evidence concerning biopsy availability and does not argue on appeal that defendant should have advised her as to the availability of such a procedure in Des Moines in 1978.

When, as here, a difference of opinion exists among the expert witnesses as to the applicable standard of care in a particular case, the question becomes one for the jury. *St. Gemme v. Tomlin* (1983), 118 Ill. App. 3d 766, 455 N.E.2d 294.

Plaintiff also argues that her expert witnesses are entitled to more credibility than defendant and his witnesses, but credibility is also a matter for the jury to resolve. The jury was fully cognizant of defendant's self-interest in justifying his conduct and was also informed as to the professional relationships that existed between the parties and some of their witnesses. Furthermore, we cannot discern that plaintiff's hired expert possessed more credibility than defendant's expert who testified free of charge.

Plaintiff also contends that defendant's negligence in failing

to obtain an informed consent was established by his admission that the by-laws of the medical staff of McDonough District Hospital require "written signed informed surgical consent" and that he did not obtain any written consent other than the general one plaintiff signed in the hospital.

The medical staff by-laws, according to which all physicians on the hospital staff have agreed to conduct themselves, require that a general consent form must be obtained from every patient admitted to the hospital and further require:

"In addition to obtaining the patient's general consent to treatment, a specific consent that informs the patient of the nature of and risks inherent in any special treatment or surgical procedure should be obtained. Appropriate forms for such consents should be adopted with the advice of local counsel."

According to defendant's testimony, appropriate forms for such special consents have never been adopted, and the standard of care in the community did not mandate obtaining such special consents in writing. Defendant also indicated that he informed plaintiff of the alternatives—either to wait for the thyroid hormone to have a chance to shrink the tumor or to perform immediate surgery—and medical witnesses corroborated defendant's opinion that there was no other appropriate alternative because of the risk that the tumor might be malignant.

Plaintiff testified that defendant informed her that there are delicate structures in the neck which require care to avoid. Her husband remembered defendant saying that there are delicate nerves that must be isolated before going ahead with surgery. Plaintiff presented evidence from two doctors that the risk of injury to the recurrent laryngeal nerve was so substantial that the standard of care for a physician in that and similar localities required that plaintiff be advised of that specific risk. As previously indicated, defendant's witnesses disagreed that the specific risk should have been disclosed.

From this evidence, we cannot say that the manifest weight of the evidence required a finding that defendant was negligent. Since the hospital medical staff had not adopted appropriate forms for written special consents, it seems obvious that failure to obtain a signed written consent would not be negligence as a matter of law. In this case, the jury was apprised of the customary practice in the community and of various medical opinions as to the standard of care in this and similar communities.

⊕4 It is the rule in Illinois that the standard of disclosure must be established through expert medical testimony. (*Miceikis v. Field*

(1976), 37 Ill. App. 3d 763, 347 N.E.2d 320; and *Green v. Hussey* (1970), 127 Ill. App. 2d 174, 262 N.E.2d 156.) It has also been held that a doctor is bound to exercise such care and diligence as a good practitioner practicing in the same or a similar community or hospital. (*Borowski v. Von Solbrig* (1973), 14 Ill. App. 3d 672, 303 N.E.2d 146, *aff'd* (1975), 60 Ill. 2d 418, 328 N.E.2d 301.) As aforesaid, we cannot say the defendant was negligent in this regard.

An excellent statement of the governing principles was made in *Taber v. Riordan* (1980), 83 Ill. App. 3d 900, 905, 403 N.E.2d 1349, 1353:

> "The duty to inform of possible complications before an operation or course of treatment can be analogized to the duty to inform the patient afterwards of complications that have arisen. The same considerations of doctor-patient relationship are applicable. These include the ability of the plaintiff to understand complicated medical problems, psychological considerations as to the best interest of the patient, the extent of the doctor's own knowledge, and other factors which might affect not only the extent but also the timing of the information. These considerations also argue for the requirement that the duty of disclosure must be measured against applicable medical standards of disclosure in the professional community."

■ Plaintiff has also argued that defendant was negligent in his postoperative treatment of her conditions. The evidence indicated that not all her complaints were indicative of vocal cord injury and that defendant was puzzled as to the cause of some of her physical problems. He noted that postoperative hoarseness can be expected, particularly in a patient who smoked heavily prior to the surgery, and the wheezing problems seemed likely to be associated with plaintiff's overweight condition. In any event, the teflon injection treatment is not appropriate until 6 to 12 months after vocal cord paralysis. Given all of these considerations, and particularly plaintiff's psychological condition, defendant's failure to refer plaintiff to a specialist before her contact with Dr. Gehrich in April of 1979 would not necessarily be negligence.

We conclude, therefore, that the issue of postoperative negligence as well as preoperative negligence were properly submitted to the jury, and the verdict in favor of defendant was not contrary to the manifest weight of the evidence.

■ Plaintiff's next contention is that the trial court erred in refusing to admit into evidence the audio and video tapes which demonstrated the quality of her voice both before surgery and after sur-

gery but before the teflon treatment. Plaintiff cites as authority cases which have held that sound and video recordings are admissible if the proper foundation has been laid to assure their authenticity and reliability. (See, *e.g., Belfield v. Coop* (1956), 8 Ill. 2d 293, 134 N.E.2d 249; and *People v. Mines* (1971), 132 Ill. App. 2d 628, 270 N.E.2d 265.) However, those cases did not involve recordings offered for the purposes of establishing voice quality. The trial court in the case at bar denied admissibility because the volume of the sound was subject to manipulation by the operator, and the strength of plaintiff's voice was at issue. The court also noted that the video tape of plaintiff conversing with a young grandson would be highly prejudicial to defendant. Further, it is clear from the record that the degree of voice damage was not a matter in dispute. Defendant admitted that plaintiff's voice is 80% to 85% of its former quality, and numerous witnesses presented uncontradicted testimony relating to the diminishment of plaintiff's strong voice which previously had been an asset to her, particularly as a teacher. Consequently, the recordings would have been merely cumulative of other evidence. Although we believe it would not have been error to admit the tapes, we will not substitute our judgment for that of the trial court. We find no abuse of the court's discretion in refusing to admit the video and audio recordings into evidence.

■ Plaintiff next contends that the court erred in permitting two pathologists from McDonough District Hospital to testify as expert witnesses on defendant's behalf when they had not previously been disclosed as expert witnesses pursuant to pretrial discovery orders. Both doctors first testified to the radioactive thyroid scans they performed on plaintiff at the hospital on August 2 and 3, 1978, which revealed the nodule and which were the basis for their recommendation that a thyroidectomy be performed. In addition, both doctors were asked several questions relating to whether fine needle biopsies were performed at the McDonough District Hospital and surrounding communities in 1978. When plaintiff objected to these questions on the ground that these witnesses were being asked to state their expert opinion without having been tendered as experts, the trial court ruled that the testimony being elicited consisted of medical facts, not opinion, and as such, it was admissible. The two doctors were not asked to testify to the standard of care applicable, but rather were questioned as to the availability of alternative tests or treatment in Macomb in 1978. No error occurred in permitting them to state their knowledge of such factual matters.

■ Plaintiff further contends that the trial court erred in in-

structing the jury on the issue of informed consent in that defendant's proposed instruction No. 3B was given while plaintiff's proposed instruction No. 12 was refused. Plaintiff's proposed instruction advised the jury that they should decide what constitutes informed consent from the evidence presented by the expert witnesses and "by provisions of any applicable rules or regulations governing the conduct of the defendant." The reference to "rules or regulations" referred to the by-laws of the medical staff of the McDonough District Hospital and, plaintiff argues, was a necessary instruction in order to apprise the jury of the applicability of the by-laws, alleged requirement that defendant inform plaintiff of the risk of damage to the recurrent laryngeal nerve and that he obtain a written special consent prior to surgery. Defendant's instruction advised the jury of the surgeon's duty to disclose the foreseeable risks and results of the proposed surgery and the alternative methods of treatment and limited the duty of disclosure to what "a reasonable medical practitioner in the same or similar localities and under the same circumstances would have disclosed."

Plaintiff does not mention that the jury was instructed to consider the by-laws provision in plaintiff's proposed instruction No. 10B, which was given and which provided, in part, that the only way the jury can determine "whether defendant possessed and applied the knowledge and used the skill and care which the law required of him is from evidence presented in this trial by the doctors called as expert witnesses and *the applicable provisions governing the conduct of the defendant.*" (Emphasis added.) The instructions given set forth the standard of disclosure adopted in *Taber v. Riordan* (1980), 83 Ill. App. 3d 900, 403 N.E.2d 1349, and other cases, and quoted above. Considering the instructions in their entirety, we believe the jury was adequately instructed in the applicable law.

■ The two final issues which plaintiff raises are both matters involving the discretion of the trial judge. Plaintiff asserts that it was error to permit Dr. Kling to testify for defendant during plaintiff's case in chief. According to the record, plaintiff interrupted her own testimony describing the surgery to call Dr. Kling. Plaintiff then objected to defendant's cross-examination of Dr. Kling relating to his assistance at surgery, and when the court upheld the objections, defendant's counsel advised Dr. Kling that he would want him to testify during defendant's case in a few days. At that time defendant's counsel learned that Dr. Kling was leaving town because of illness in the family and would not be available during the time defendant would be presenting evidence. At that point, defendant requested that he be

permitted to call Dr. Kling out of order, and the court granted the request. Considering the importance of Dr. Kling's testimony as an eyewitness to the surgery, we cannot say that the court abused its discretion. We also note that plaintiff was allowed to call two of her witnesses out of order. The court obviously tried to be fair to both parties in the matter of accommodating witnesses. He did not abuse his discretion.

Finally, plaintiff contends that the court erred in failing to give plaintiff an opportunity to poll the jury after the verdict was announced. Illinois courts have held that any complaint about a failure to poll the jury is waived by a party's failure to request such a poll. (*Joynt v. Barnes* (1979), 71 Ill. App. 3d 187, 388 N.E.2d 1298.) Here, there was no timely request. Hence, any error was waived.

For the reasons stated, we affirm the judgment of the circuit court of McDonough County.

Affirmed.

HEIPLE, P.J., and SCOTT, J., concur.