SANFORD WELTON, JR., *et al.*, Co-Special-Representatives for the Estate of Sanford Welton, Sr., Deceased, Plaintiffs-Appellants, v. JAMES AMBROSE *et al.*, Defendants-Appellees.

Fourth District    No. 4—03—0590

Argued June 23, 2004.—Opinion filed August 17, 2004.—Rehearing denied September 15, 2004.

628

James Walker (argued), of Walker & Wylder, Ltd., of Bloomington, for appellants.

Paulette F. Dove (argued), of Drake, Narup & Mead, P.C., of Springfield, for appellee James Ambrose.

Edward J. Cunningham (argued), of Brown, Hay & Stephens, of Springfield, for appellee Memorial Medical Center.

JUSTICE COOK delivered the opinion of the court:
Plaintiffs, Sanford Welton, Jr., and Adair Ward, are the co-special-

representatives for the estate of Sanford Welton, Sr. They appeal from the Sangamon County circuit court's order granting summary judgment in favor of defendants, Dr. James Ambrose and Memorial Medical Center. We affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

In 1994, Sanford Welton, Sr. (Welton), went to Memorial Medical Center in Springfield (Memorial) because he noticed that he was becoming excessively fatigued while walking. His doctors determined that surgery could address this problem but that he first needed to undergo a coronary bypass procedure. Dr. William Pyle of Memorial successfully performed the coronary bypass surgery in August 1994.

On the morning of December 7, 1994, Welton returned to Memorial for aorto-bifemoral bypass, left femoral popliteal bypass, and left renal artery bypass surgery to correct the problem with his legs. Pyle conducted this operation as well, and defendant James Ambrose served as the anesthesiologist.

Elayne Whitlock, Welton's wife at the time, accompanied him to Memorial. When they arrived, they spoke first to a nurse, then to an anesthesiologist, whom Whitlock remembered as a dark-complected, apparently Indian man who spoke with an accent. This anesthesiologist suggested that Welton agree to an "epidural" during and after the surgery to control the pain. After first declining, Welton agreed. Neither Whitlock nor Welton remembered seeing Ambrose before the surgery. That morning, Welton signed a form called "Consent to Operative Surgical Procedure." It contained a section that read: "I consent to the administration of anesthesia to be applied by or under the direction of the staff anesthesiologists and to the use of such anesthetics as they may deem advisable."

Before the surgery began, Ambrose placed an epidural catheter in Welton's lumbar region to manage pain during and after the operation. Welton received the drugs fentanyl and bupivacaine, among others, through the epidural. The surgery lasted from 8:40 a.m. until 4:55 p.m., and a few minutes later Welton was taken to a recovery room. He did not see Ambrose again until two days later.

Ambrose is a shareholder of and employed by Associated Anesthesiologists of Springfield (Associated), a corporation that maintains an office at Memorial. Associated maintains a staff of doctors 24 hours a day to provide "pain service" at Memorial. The particular doctor on call ordinarily visits each patient on anesthesia once in the morning and once in the evening.

The morning after the surgery, December 8, Dr. Prasad Kareti of

Associated saw Welton and noted that he seemed comfortable and pain-free. At 11:20 a.m. that day, however, two nurses tried to take Welton to use the bathroom and found that he had trouble using his legs. A nurse reported this to Pyle, the surgeon, who determined that it was not abnormal for Welton's legs to be weak so soon after surgery. The same day, Dr. Ramaiah Samala of Associated visited Welton during his evening rounds. Ramaiah found that Welton remained comfortable and free of pain. The epidural remained in place throughout this time.

A nurse recorded on Welton's medical chart that at 7:45 a.m. on December 9, he was having seizure-like activity in his face, arms, and hands, "could only utter words yes, yes, yes," and could not follow commands. Early on December 9, someone turned off the pump attached to the epidural. It is not clear who turned off the pump or exactly when this happened. From December 9 until his death, Welton was paralyzed from the chest down. He was discharged from the hospital in March 1995.

On November 22, 1996, Welton filed a complaint against Ambrose only, alleging that he was negligent in failing to monitor Welton's blood pressure and neurological condition and in failing to discontinue the epidural pump after it was reported that Welton had neurological deficits. A report by Dr. Mervyn Jeffries attached to the complaint offered the opinion that Welton's paraplegia was caused by complications when the epidural anesthesia established during the operation was continued for too long afterward and that the epidural should have been removed after Welton's trouble using his legs on December 8 at 11:20 a.m.

Welton later learned that although Ambrose claimed that he conducted a preanesthetic evaluation on every patient he anesthetized, including Welton, neither he nor Memorial possessed a preanesthetic evaluation form for the December 7, 1994, surgery. Welton then filed a first-amended complaint on November 8, 1999. In addition to raising new allegations to support the negligence claim against Ambrose, Welton added three new claims. Count II alleged lack of informed consent, and count III alleged battery. Finally, count IV added Memorial as a defendant and claimed spoliation of evidence for its loss of the preanesthetic evaluation form.

Welton died of atherosclerotic cardiovascular disease on April 9, 2001. Plaintiffs, Sanford Welton, Jr., and Adair Ward, as representatives of Welton's estate, filed an eight-count, second-amended complaint, in which they continued the previous claims and also realleged them as wrongful-death claims. Ambrose moved for summary judgment as to counts I, II, III, V, VI, and VII. Memorial then moved

for summary judgment as to counts IV and VIII. On June 18, 2003, the circuit court granted summary judgment as to all eight counts of the complaint. A docket entry records this event, but the court did not enter a written order.

On July 14, 2003, plaintiffs filed a notice of appeal. The same day, Memorial filed a "Motion for Clarification," seeking to amend certain errors in the docket entry of June 18, 2003. After a hearing on July 25, 2003, the circuit court granted the motion for clarification and issued a written order to that effect on July 31.

## II. ANALYSIS

### A. Preliminary Matters

#### 1. *Jurisdiction*

■ We must first address whether we have jurisdiction to hear this appeal. Defendants argue that the motion for clarification was essentially a posttrial motion and that plaintiffs' notice of appeal was therefore premature. Under Supreme Court Rule 303(a), a party wishing to appeal must file a notice of appeal "within 30 days after the entry of the final judgment appealed from" or "within 30 days after the entry of the order disposing of the last pending post[ ]judgment motion" if one has been filed. 155 Ill. 2d R. 303(a)(1). The filing of the postjudgment motion renders the prior notice of appeal of no effect. See 155 Ill. 2d R. 303(a)(2); *John G. Phillips & Associates v. Brown*, 197 Ill. 2d 337, 343, 757 N.E.2d 875, 879 (2001) (postjudgment motion for sanctions under Rule 137 (155 Ill. 2d R. 137)).

Only a motion specified in section 2—1203 of the Code of Civil Procedure (735 ILCS 5/2—1203 (West 2002)) qualifies as a postjudgment motion. *Marsh v. Evangelical Covenant Church of Hinsdale*, 138 Ill. 2d 458, 461, 563 N.E.2d 459, 461 (1990). That section allows for a party to file a motion "for a rehearing, or a retrial, or modification of the judgment or to vacate the judgment or for other relief." 735 ILCS 5/2—1203(a) (West 2002). A motion seeks "other relief" within the meaning of the statute only if it is similar in nature to the enumerated motions. *Marsh*, 138 Ill. 2d at 461, 563 N.E.2d at 462.

We conclude that Memorial's motion for clarification was not a motion for "other relief" within the meaning of section 2—1203. A motion for clarification of a trial court's previous action has been held not to fall within section 2—1203. *Giammanco v. Giammanco*, 253 Ill. App. 3d 750, 756-57, 625 N.E.2d 990, 996 (1993) (Second District). Although we have held before that a plaintiff's motion for findings after the complaint was dismissed could constitute such "other relief" (*Knapp v. City of Decatur*, 160 Ill. App. 3d 498, 503, 513 N.E.2d 534,

537 (1987)), we noted that the plaintiffs' motion did not expressly accept the court's judgment (*Knapp*, 160 Ill. App. 3d at 503, 513 N.E.2d at 536).

Here, Memorial's motion did accept the circuit court's judgment and sought only to correct a double negative in the docket entry, in a sentence that originally read: "There's no contrary evidence that [p]laintiff did not die as a result of the epidural." The context makes clear that the sentence should have said: "There is no evidence that [p]laintiff did die as a result of the epidural," which is how the corrected version appears. The court's order also corrected two other minor errors. Memorial's motion made no objection to the actual judgment (granting the summary judgment motion in its favor) and in fact stated that it sought to correct a "clerical" or "typographical" error. We reject defendants' contention that such a motion was so similar to the forms of relief named in section 2—1203 that it rendered plaintiffs' notice of appeal premature. Such relief could have been sought in a motion for a *nunc pro tunc* order long after the judgment had become final. *In re Estate of Young*, 414 Ill. 525, 534, 112 N.E.2d 113, 117 (1953). We thus consider the merits of the appeal.

## 2. *Discovery*

■ Plaintiffs argue that the circuit court erred in its ruling concerning their "First Request for Discovery." (This document was filed before Welton's death but to simplify our discussion, we shall refer to both Welton and the current plaintiffs as plaintiffs.) We generally review a trial court's discovery rulings for whether they constituted an abuse of discretion. *Reda v. Advocate Health Care*, 199 Ill. 2d 47, 54, 765 N.E.2d 1002, 1007 (2002). Plaintiffs suggest that we should review the discovery questions here using a *de novo* standard, but the case cited for that standard involves claims of a statutory evidentiary privilege. *Reda*, 199 Ill. 2d at 54, 765 N.E.2d at 1007. The general rule remains that we use the abuse-of-discretion standard.

The discovery request at issue contained 33 separate paragraphs seeking numerous types of documents from Ambrose. Ambrose filed an "objection" specifically addressing many of the requests and objecting "to the entire [r]equest to [p]roduce as unduly burdensome, overly broad[,] and costly to comply with." Plaintiffs responded by filing a motion to compel Ambrose to comply with the discovery request, at the same time withdrawing 5 of the 33 paragraphs. After a hearing, the circuit court ordered Ambrose to respond to 9 of the pending 28 paragraphs but denied plaintiffs' motion as to the remainder.

Plaintiffs stress that a party may discover not only information admissible at trial but also information that may lead to admissible

evidence. See *Monier v. Chamberlain*, 35 Ill. 2d 351, 357, 221 N.E.2d 410, 415 (1966). Although the scope of permissible discovery is indeed broad, it is not unlimited, and the circuit court in exercising its discretion must balance "the needs of truth and excessive burden to the litigants." *People ex rel. General Motors Corp. v. Bua*, 37 Ill. 2d 180, 193, 226 N.E.2d 6, 14 (1967). Further, a court ruling on a discovery motion may keep in mind Supreme Court Rule 201(a), which states that "[d]uplication of discovery methods to obtain the same information should be avoided." 166 Ill. 2d R. 201(a).

Ambrose objected to the first four paragraphs of the request as overly broad because they asked for billing records related to anesthesia care provided to Welton but were not limited either in time or in referring to care rendered by Ambrose. A party to litigation may certainly object that a discovery request is overly broad. *Bua*, 37 Ill. 2d at 194, 226 N.E.2d at 15 (upholding the defendant's objection to a "catch[ ]all demand for the production of documents without the slightest degree of specificity"). On the other hand, despite these requests' somewhat broad wording, surely Ambrose could have provided the records related to the surgery at issue in this case. These records might shed light on the services actually provided and thus are properly discoverable. The trial court may wish to revisit this particular issue on remand.

Several other paragraphs (8, 11, 12, 19, 31, and 32) sought Memorial's bylaws and various rules, regulations, policies, and procedures. Ambrose objected that plaintiffs had already obtained many of these in deposing Penny Mueller, administrator of quality monitoring at Memorial. We have reviewed these and the remainder of plaintiffs' request to produce and conclude that the trial court did not abuse its discretion in ruling on the motion to compel.

## B. Summary Judgment

■ Plaintiffs argue that the trial court erred in granting summary judgment as to all eight counts of the complaint. In reviewing a grant of summary judgment, we must consider the affidavits, depositions, admissions, exhibits, and pleadings on file in the light most favorable to the nonmoving party. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113, 649 N.E.2d 1323, 1326 (1995). Summary judgment is a drastic means of disposing of a lawsuit, in that it denies the nonmoving party a trial, and it is properly granted only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Espinoza*, 165 Ill. 2d at 113, 649 N.E.2d at 1326. The party moving for summary judgment bears the initial burden of production, and a defendant may meet this burden either by

(1) affirmatively demonstrating that it must prevail on an element of the cause of action or (2) demonstrating that the plaintiff cannot produce evidence necessary to support the plaintiff's cause of action. *Hall v. Flowers*, 343 Ill. App. 3d 462, 469-70, 798 N.E.2d 757, 762 (2003). If the defendant meets this standard, then the burden shifts to the plaintiff to present a factual basis that would entitle the plaintiff to a favorable judgment. *Hall*, 343 Ill. App. 3d at 470, 798 N.E.2d at 762. We review a circuit court's grant of summary judgment *de novo*. *Espinoza*, 165 Ill. 2d at 113, 649 N.E.2d at 1326.

### 1. *Negligence*

Plaintiffs' second-amended complaint alleged that Ambrose was negligent in 1 of 11 ways, set out in paragraph 23 as subparagraphs (a) through (k). In part, these allegations rest on the proposition that the other members of Associated who took part in Welton's care were agents of Ambrose, but the complaint also alleges that Ambrose himself was negligent in failing to monitor Welton's condition following the surgery. The docket entry documenting the grant of summary judgment stated that "no other physicians acted as agents of Dr. Ambrose" and "Dr. Ambrose was not negligent."

Plaintiffs argue that Ambrose has admitted that the other doctors of Associated were his agents and he is thus vicariously liable for their actions. They base this claim on a health-insurance claim form dated December 16, 1994, and submitted to CIGNA for services provided to Welton. The form's signature block contains Ambrose's typewritten name. The form is difficult to read, but plaintiffs have also provided a legible copy from a different patient and doctor. The signature portion of this form states that "I certify that the statements on the reverse apply to this bill and are made a part thereof." On the reverse, under the heading "Signature of Physician or Supplier (Medicare, CHAMPUS, FECA, and Black Lung)," the following appears:

> "I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations."

Assuming that the barely legible form with Ambrose's name on it contains this certification on the back, this alone does not seem to us sufficient evidence to suggest an agency relationship. The certification appears only to apply to claims involving the listed programs (*e.g.*, Medicare), and nothing suggests that Welton fell into these categories.

Plaintiffs also argue, citing *Steinberg v. Dunseth*, 259 Ill. App. 3d 533, 631 N.E.2d 809 (1994), that Ambrose is liable for the acts of his

"partners" in Associated because he is employed together with them and he left Welton in their care. In *Steinberg,* the coverage agreement required the doctors "to assume the care of the other's patients if one of them was required to be out of town." *Steinberg,* 259 Ill. App. 3d at 534, 631 N.E.2d at 810. The covering physician in *Steinberg* performed a surgical procedure, and the plaintiff signed a consent for that treatment by the covering physician. *Steinberg,* 259 Ill. App. 3d at 535, 631 N.E.2d at 811. We agreed with the New York cases that even absent emergencies " 'surely no person expects that his or her regular physician will always be there to respond.' " (Emphasis omitted.) *Steinberg,* 259 Ill. App. 3d at 537, 631 N.E.2d at 812, quoting *Kavanaugh v. Nussbaum,* 71 N.Y.2d 535, 548, 528 N.Y.S.2d 8, 13, 523 N.E.2d 284, 289 (1988). However, we commented that physicians should not be viewed as interchangeable and it is important that the various treatments given a patient be coordinated. *Steinberg,* 259 Ill. App. 3d at 538, 631 N.E.2d at 813. In *Steinberg,* 259 Ill. App. 3d at 538, 631 N.E.2d at 813, we did not approve the routine substitution of other physicians for a physician who has had the major care of the patient, the situation in this case.

We need not make a definitive ruling on the application of *Steinberg* or the agency issue, however, because we conclude for other reasons that summary judgment was improperly granted as to the negligence count. To prevail on a claim of negligence in a medical malpractice case, a plaintiff must be able to show (1) the proper standard of care that applied to the physician's actions, (2) the physician's failure to comply with this standard, and (3) that this failure proximately caused the plaintiff's injury. *Purtill v. Hess,* 111 Ill. 2d 229, 241-42, 489 N.E.2d 867, 872 (1986).

In support of their allegations, plaintiffs point to the deposition of their expert, Dr. Mervyn Jeffries. He testified that because Ambrose was the doctor who inserted the epidural, Ambrose had a personal responsibility to monitor Welton's progress after the operation. He stated that Ambrose should have seen Welton at least twice the day after the surgery and monitored him to some extent for two days after such a major operation. He further stated that Welton's paraplegia was avoidable and that had Ambrose properly monitored his condition, it would probably have been averted.

Dr. Jeffries's deposition provided sufficient evidence on the necessary elements to raise a genuine issue of material fact as to whether Ambrose was negligent when he did not personally monitor Welton on the two days after the surgery. The trial court thus erred in granting summary judgment on the negligence count.

## 2. *Lack of Informed Consent*

■ Plaintiffs' count II alleged that Ambrose failed to obtain Welton's informed consent prior to administering the epidural. A cause of action based on lack of informed consent requires a plaintiff to show that (1) the physician had a duty to disclose material risks; (2) he failed to disclose or inadequately disclosed those risks; (3) as a result of this failure to disclose, the plaintiff consented to treatment to which he would not otherwise have consented; and (4) the treatment caused plaintiff injury. *Coryell v. Smith*, 274 Ill. App. 3d 543, 546, 653 N.E.2d 1317, 1319 (1995).

Ambrose's response to the informed-consent allegation is twofold: he contends that Welton gave a valid consent and that plaintiffs cannot show that paralysis was a "material risk" of the epidural such that Ambrose had an obligation to disclose it. We agree with the latter contention. Evidence that Welton was not specifically told of the risk of paralysis is not enough. Informed consent does not mean that a physician must reveal every risk of a procedure, no matter how remote. Rather, a physician must disclose to the patient the risks that a reasonable medical practitioner would have disclosed in similar circumstances. *Magana v. Elie*, 108 Ill. App. 3d 1028, 1032, 439 N.E.2d 1319, 1321 (1982). A plaintiff must show the physician's failure to conform to this standard by expert medical evidence. *Magana*, 108 Ill. App. 3d at 1032, 439 N.E.2d at 1322; *Taber v. Riordan*, 83 Ill. App. 3d 900, 905, 403 N.E.2d 1349, 1353 (1980).

Plaintiffs point to evidence that paralysis was a known risk of an epidural at the time of the operation but none saying that it was a risk that a reasonable medical practitioner would have disclosed before using one. The closest thing they can find is the interrogatory answer of Dr. Gary Draper, in which he states that the risks that would customarily have been discussed before administering an epidural

> "include backache (usually transient): possible headaches, nausea[,] and prucrites (itching). Others might be included depending on the individual doctor. This group would possibly include paralysis since it is a rare occurrence and may be secondary to events other than an epidural."

Draper's response that the possible disclosure of the risk of paralysis would depend on the doctor is insufficient to raise a genuine issue as to whether a reasonable medical practitioner would have discussed the possibility with the patient.

## 3. *Battery*

■ Plaintiffs next contend that Ambrose's use of an epidural constituted a medical battery. We disagree. A battery generally is defined as an unauthorized touching of another's person. *Curtis v.*

*Jaskey*, 326 Ill. App. 3d 90, 93, 759 N.E.2d 962, 964 (2001). In a medical context, a plaintiff may recover by showing (1) a total lack of consent to the procedure performed, (2) that the treatment was contrary to the patient's will, or (3) that the treatment was at substantial variance with the consent granted. *Curtis*, 326 Ill. App. 3d at 94, 759 N.E.2d at 965.

It is clear in this case that Welton gave somebody (the anonymous dark-complected anesthesiologist) his consent to the use of the epidural during and after surgery. In addition, he signed the form consenting to the surgery, including "the administration of anesthesia *** by or under the direction of the staff anesthesiologists." Plaintiffs claim that the consent must be obtained by the particular physician who inserts the epidural, but no evidence suggests that Welton's consent was limited to particular physicians. The surgical consent form, referring to the "staff anesthesiologists," states just the opposite. Because Welton consented to the insertion of the epidural and its continued use, as well as to anesthesia administered by the staff, no battery occurred.

### 4. *Spoliation of Evidence*

■ Plaintiffs' count IV alleged spoliation of evidence by Memorial, claiming that they were hampered in pursuing their lawsuit by the loss of the preanesthetic evaluation form filled out by Ambrose. Spoliation of evidence is a form of negligence, and as such requires a showing that the defendant owed the plaintiff a duty to preserve evidence, breached that duty, and thereby proximately caused the plaintiff to be unable to prove the underlying cause of action. *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 194-95, 652 N.E.2d 267, 270 (1995). We shall assume for the moment that the form at issue existed, Memorial had a duty to maintain it, and Memorial lost the form. Plaintiffs must still be able to show that Memorial's loss or destruction of the evidence denied them a "reasonable probability" of succeeding on the underlying action. See *Boyd*, 166 Ill. 2d at 196 n.2, 652 N.E.2d at 271 n.2. "In other words, if the plaintiff could not prevail in the underlying action even with the lost or destroyed evidence, then the defendant's conduct is not the cause of the loss of the lawsuit." *Boyd*, 166 Ill. 2d at 196 n.2, 652 N.E.2d at 271 n.2.

Plaintiffs do not adequately explain how the lost form could aid them in proving lack of informed consent or battery. Ambrose stated at his deposition that he routinely fills out such a form before administering anesthesia and that the physician but not the patient signs the form. The record contains a blank copy of the form, which contains a signature line for the physician, not the patient. As such, it

would seem that the absence of such a form actually helps plaintiffs because it would have tended to show that Welton consented to Ambrose personally before receiving the epidural.

Plaintiffs suggest Ambrose might have written "DO NOT USE EPIDURAL!" or something similar on the form, but this is mere speculation. Even if those words appeared on the form, there would be no reasonable probability that plaintiffs could prevail on their claims. The informed-consent count fails because plaintiffs cannot show that paralysis is a material risk of an epidural. There was no battery, regardless of any conceivable hesitancy by Ambrose in using an epidural, because the evidence is undisputed that Welton consented to its use. Finally, the form has no bearing on whether Ambrose was negligent in failing to monitor the epidural once it was in use, nor do plaintiffs maintain that it was negligent to use one.

### 5. *Wrongful Death*

■ Counts V through VIII of the second-amended complaint essentially realleged the first four counts as wrongful-death claims. Plaintiffs do not appear to challenge the dismissal of the first three wrongful-death counts (V, VI, and VII), addressing only count VIII in their brief. As to that count, Memorial points to an autopsy conducted by Dr. Bryan Mitchell, in which he concluded that Welton's death was caused by atherosclerotic cardiovascular disease.

The autopsy appears to be the only evidence in the record of what caused Welton's death. Plaintiffs object that the autopsy is hearsay and otherwise inadmissible. This ignores the fact that Memorial filed a request to admit the authenticity of the autopsy, which the circuit court eventually allowed.

In any event, a wrongful-death action requires the plaintiff to show that the wrongful act of another caused the death of the decedent. 740 ILCS 180/1 (West 2002). Regardless of whether cardiovascular disease caused Welton's death, without any evidence at all that his death resulted in any way from the epidural, defendants were entitled to summary judgment on the wrongful-death counts.

### III. CONCLUSION

For the foregoing reasons, we affirm the circuit court's order dismissing counts II, III, IV, V, VI, VII, and VIII of plaintiffs' second-amended complaint. We reverse summary judgment as to count I and remand for further proceedings.

Affirmed in part and reversed in part; cause remanded.

STEIGMANN and APPLETON, JJ., concur.