THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, Plaintiff-Appellee, v. ABC-NACO, Defendant-Appellant (TTX Company, Defendant-Appellee; Norfolk Southern Railway Company, Defendant).

First District (4th Division)    No. 1—07—0043

Modified opinion filed March 31, 2009.

BryceDowney, LLC, of Chicago (Geoffrey A. Bryce and Terrence J. Madden, of counsel), for appellant.

Freeborn & Peters LLP, of Chicago (Richard T. Sikes, Jr., and David S. Becker, of counsel), for appellee Burlington Northern & Santa Fe Railway Company.

Swanson, Martin & Bell, LLP, of Chicago (Kevin V. Boyle and Richard Keating, of counsel), for appellee TTX Company.

JUSTICE GALLAGHER delivered the modified opinion of the court on rehearing:

The Burlington Northern & Santa Fe Railway Company (BNSF) brought an action against defendants ABC-NACO (NACO), TTX Company and Norfolk Southern Railway Company for damages from the June 6, 2001, derailment of 26 cars of a freight train traveling through a region of the Arizona desert known as Eagle Nest. No one was injured as a result of the derailment. A jury trial was held in which NACO was the lone remaining defendant.

NACO now appeals the verdict against it on numerous grounds, including the strength of the evidence against it. For the reasons set forth below, we affirm the jury's verdict, and we conclude that NACO is entitled to a setoff of $5.2 million, reflecting Illinois law, against the $4.4 million judgment against it. We also affirm the trial court's grant of summary judgment to TTX on NACO's counterclaim.

## BACKGROUND

BNSF's complaint, filed in June 2003 in Cook County circuit court, alleged that the derailment was caused by a defective transom on one of the railroad cars. BNSF alleged that the transom broke and that a portion of the transom hung below the top of the rail on which the train was traveling. Most of the railcars involved in the derailment were transporting new automobiles, many of which were almost entirely damaged or destroyed.

The transom at issue in this case was designed by NACO. The entire railcar, including the transom, was manufactured by TTX. A railcar transom is connected to the truck assembly that carries a railcar, and its purpose is to keep the sides of the truck together so the railcar remains in alignment on top of the rail, especially while traveling on a curve. Transoms can be formed from one piece of steel or fabricated from separate pieces of material. The transom at issue in this case was fabricated and had been welded to repair cracking.

Count I of BNSF's complaint sought damages from NACO and TTX based on a strict liability theory of product liability, asserting that NACO and/or TTX did not properly design, manufacture or assemble the transom and that the transom was defective and inherently dangerous when it left their possession. In count II, BNSF alleged negligence against NACO and TTX in the design, manufacture and assembly of the transom, contending that those defendants should have known the transom was not suitable for its intended use. Count III alleged that Norfolk Southern welded the transom at issue in a Norfolk Southern repair shop on May 7, 2001, about a month before the derailment occurred, and that the welding repairs were negligent. Counts IV and V alleged breach of express warranty against TTX and breach of implied warranty against TTX and NACO.

NACO admitted that it designed the transom but denied that it was defective and denied that the transom caused the derailment. Before trial, TTX and Norfolk Southern each settled with BNSF for $2.6 million, or a total settlement of $5.2 million. On September 7, 2005, the trial court entered a written order approving the settlement and dismissing all claims against TTX and Norfolk Southern, except NACO's implied indemnity claim against TTX. The order indicated that NACO, as the remaining defendant, would be entitled to a setoff

of $5.2 million against a future jury verdict in accordance with the Illinois Joint Tortfeasor Contribution Act (the Illinois Contribution Act) (740 ILCS 100/1 *et seq.* (West 2002)). The order included language pursuant to Illinois Supreme Court Rule 304(a) (210 Ill. 2d R. 304(a)) that the trial court found no just reason existed to delay an appeal of that order.

After the entry of that order, BNSF filed a motion *in limine* requesting that the court apply Arizona law to this case. NACO responded that the trial court already had determined its right to a setoff under Illinois law as reflected in the September 7, 2005, order, from which no appeal had been taken. After lengthy debate between the parties and the trial court, the court granted BNSF's motion and ruled that it would apply Arizona law to the merits of this case.

Under the Arizona statute, NACO was considered a "manufacturer" of the transom. NACO amended its answer to raise several affirmative defenses available under Arizona's product liability statute. NACO contended, *inter alia*, that Norfolk Southern's repair modified the transom in a way that was not reasonably foreseeable and that did not comply with a written specification for repair ("Specification No. 30"). NACO further asserted that BNSF failed to mitigate its damages because its investigative crew dragged and overturned several railcars while clearing the accident site. As to the negligence count, NACO contended that BNSF was contributorily negligent because BNSF received maintenance warnings to inspect transoms for cracking and that BNSF should have discovered in its own inspections that the transom was improperly repaired.

A jury trial was held in January and February 2006. The record on appeal is lengthy, numbering close to 70 volumes, and, accordingly, specific trial testimony will be recounted below when relevant to the issues raised on appeal. The jury was instructed as to Arizona substantive law. All defendants were listed on the jury verdict forms pertaining to liability. The jury returned a verdict for BNSF and awarded total damages of approximately $8.3 million. On the strict liability count, the jury apportioned the relative degrees of fault as 50% NACO, 45% TTX and 5% Norfolk Southern. As to the negligence count, the jury found NACO 53% at fault, TTX to be 40% at fault, Norfolk Southern 5% at fault and BNSF 2% at fault.

The court entered judgment against NACO representing 53% of the total verdict, or approximately $4.4 million. The court's order further stated, despite the prior ruling that Illinois law would apply to the setoff issue, that "pursuant to Arizona law, this judgment will not [be] subject to any set-off." Therefore, applying Arizona's several liability statute, the court did not apply the $5.2 million setoff representing the settlements by TTX and Norfolk Southern.

NACO argued in a posttrial motion that despite the application of Arizona law to the merits of the case, the setoff reflecting Illinois contribution law should have been awarded in keeping with the trial court's September 7, 2005, order. NACO also asserted that it was entitled to judgment notwithstanding the verdict or, in the alternative, a new trial. The trial court denied NACO's posttrial motion, and this appeal followed.

## ANALYSIS

On appeal, NACO first contends that the trial court was bound by its original ruling that the $5.2 million setoff under Illinois law should be applied, which would erase the $4.4 million judgment against NACO in its entirety. NACO argues that the trial court could have applied the setoff under Illinois law even after the court concluded that Arizona law governed the substance of the complaint. In the alternative, NACO asserts that a new trial is warranted because the court erred in applying Arizona law to the merits of BNSF's claims.

## I. Choice-of-Law Issues

### A. Substantive Law to be Applied

We first consider whether the trial court correctly ruled that Arizona product liability law should apply in this case because the outcome of that inquiry affects our review of NACO's remaining contentions. A trial court's choice of law is reviewed *de novo*. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 154, 879 N.E.2d 893, 898 (2007). A choice-of-law determination is required only when a difference in the law of the states will affect the outcome. *Townsend*, 227 Ill. 2d at 155, 879 N.E.2d at 898. Therefore, we consider whether a difference exists in the product liability laws of Arizona and Illinois. (The parties agree that the law of those two states differs on the issue of contribution among tortfeasors, which will be discussed later in more detail.)

BNSF's complaint raised claims of strict product liability and negligence as to the design and manufacture of the transom. Illinois and Arizona both recognize strict liability in tort for product liability, and, more specifically, for the defective design of a product. See *Townsend*, 227 Ill. 2d at 156, 879 N.E.2d at 899; *Woodill v. Parke Davis & Co.*, 79 Ill. 2d 26, 402 N.E.2d 194 (1980) (generally); *Golonka v. General Motors Corp.*, 204 Ariz. 575, 579, 65 P.3d 956, 960 (App. 2003). The trial court applied Arizona's product liability statute and held that NACO, as the designer of the transom, was a "manufacturer" as a matter of law because the Arizona statute includes the designer of a product in the chain of culpability for a defective item. See Ariz.

Rev. Stat. §12—681(3) (LexisNexis 2004) (a "manufacturer" is a "person or entity that designs, assembles, fabricates, produces, constructs or otherwise prepares a product or component part of a product before its sale"). Thus, by statute in Arizona, a designer is subject to strict liability for a design defect.

Illinois law lacks a similar definition. NACO asserts that had Illinois law been applied, it would not have faced strict liability for a design defect as the designer of the transom, as opposed to its manufacturer (TTX). NACO relies upon *Harms v. Caterpillar Tractor Co.*, 80 Ill. App. 3d 262, 264, 399 N.E.2d 722, 723 (1980), which held that product liability is limited "to those parties in the chain of manufacturing and distributing a product." More recently, this court has noted in an automobile product liability case that "all entities in the distributive chain of an allegedly defective product, including manufacturers, sellers, wholesalers, distributors and lessors of the product," are strictly liable for injuries resulting from that product. *Murphy v. Mancari's Chrysler Plymouth, Inc.*, 381 Ill. App. 3d 768, 772-73, 887 N.E.2d 569, 574 (2008); see also *Smith v. F.W.D. Corp.*, 106 Ill. App. 3d 429, 433, 436 N.E.2d 35 (1982) (electing not to resolve the briefed issue of "whether a product designer may be held strictly liable in tort for a design defect").

Products are often designed and manufactured by the same defendant company. The record reveals a dispute as to whether NACO's role was limited to the design process, since BNSF describes a collaborative effort between NACO and TTX. For our purposes, it is sufficient to state that as to NACO's potential exposure on a strict liability theory of product liability, a difference could exist in the applicable laws of Arizona and Illinois such that a choice-of-law analysis is necessary.

A choice-of-law determination is required when a difference in the law of the states will affect the outcome, using the choice-of-law rules of Illinois as the forum state. See *Townsend*, 227 Ill. 2d at 155, 879 N.E.2d at 898. Illinois observes the methodology set out in the Restatement (Second) of Conflict of Laws (hereinafter Second Restatement). Restatement (Second) of Conflict of Laws §6 (1971); see also *Townsend*, 227 Ill. 2d at 155, 879 N.E.2d at 898; *Ingersoll v. Klein*, 46 Ill. 2d 42, 262 N.E.2d 593 (1970).

The cornerstone of the Second Restatement is the "most significant relationship" test, the objective of which is "to apply the law of the state that, with regard to the particular issue, has the most significant relationship with the parties and the dispute." E. Scoles, P. Hay, P. Borchers & S. Symeonides, Conflict of Laws §2.14, at 61 (4th ed. 2004); see also *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45,

61, 879 N.E.2d 910, 919 (2007). The "most significant relationship" test has been described, not as a self-contained analysis, but, rather, as a description of the preferred outcome: to apply the law of the state that has the closest relationship to the parties and the dispute. *Townsend*, 227 Ill. 2d at 159-60, 879 N.E.2d at 901, citing E. Scoles, P. Hay, P. Borchers & S. Symeonides, Conflict of Laws §2.14, at 61 (4th ed. 2004).

■ Section 6 of the Second Restatement provides a list of basic factors relevant to a choice of the applicable rule of law:

"(a) the needs of the interstate and international systems;

(b) the relevant policies of the forum;

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

(d) the protection of justified expectations;

(e) the basic policies underlying the particular field of law;

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws §6, at 10 (1971).

The section 6 factors have been referred to as a "laundry list" of the relevant concepts that were not reflected in the previous choice-of-law rules. *Townsend*, 227 Ill. 2d at 159, 879 N.E.2d at 900-01, citing R. Cramton, D. Currie & H. Kay, Conflict of Laws: Cases—Comments—Questions 117 (5th ed. 1993).

In choosing the law applicable to an issue in a tort case, our supreme court has considered the factors in section 6 alongside the contacts set out in section 145 of the Second Restatement:

"(1) the place where the physical injury to the plaintiff's property occurred;

(2) the place where the conduct causing the injury occurred;

(3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

(4) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws §145(2), at 414 (1971).

See also *Townsend*, 227 Ill. 2d at 167, 879 N.E.2d at 905.

Because no personal injuries occurred in the derailment, we look to section 147 of the Second Restatement, which addresses injuries to "tangible things." A presumption exists that the law to be applied is that of the state where the accident and/or injury occurred. Restatement (Second) of Conflict of Laws §147, at 438 (1971); see also *Townsend*, 227 Ill. 2d at 163, 879 N.E.2d at 903. BNSF places great weight on the site of the derailment in Arizona, and BNSF further asserts that it does business in Arizona by operating a railroad through

the state and that its "land and railroad fixtures have a settled relationship to Arizona."

The derailment site itself was clearly random; a train could derail at any location along the rail system of this country. See generally *Townsend*, 227 Ill. 2d at 168, 879 N.E.2d at 905-06 ("situations exist where the place of the injury will not be an important contact, for example, where the place of the injury is fortuitous"). Nevertheless, because Arizona was the site of the incident, a presumption exists in favor of applying Arizona law unless Illinois has a more significant relationship with the occurrence and the parties. See *Townsend*, 227 Ill. 2d at 163, 879 N.E.2d at 903; see also *In re Air Crash Disaster Near Chicago, Illinois, on May 25, 1979*, 644 F.2d 594, 616 (7th Cir. 1981).

■ Thus, in weighing Illinois against the presumptive choice of Arizona, we apply a three-step process of isolating the issue, identifying the policies in the conflicting laws, and examining the contacts of the states to determine which state has a superior connection and interest in having its law applied. *Townsend*, 227 Ill. 2d at 167, 879 N.E.2d at 905; see also *Wreglesworth v. Arctco, Inc.*, 316 Ill. App. 3d 1023, 1031, 738 N.E.2d 964, 971 (2000). The Illinois Supreme Court described this analysis as "essentially first identifying the relevant section 6 general principles and then applying the four section 145(2) contacts," though the court found it irrelevant which group of considerations is addressed first. *Townsend*, 227 Ill. 2d at 167-68, 879 N.E.2d at 905.

■ BNSF is a Delaware corporation with its principal place of business in Texas, and NACO is a Delaware corporation with its principal place of business in Illinois. TTX and Norfolk Southern had been dismissed from the lawsuit, and their contacts are therefore not relevant to his analysis, though we note for the record that TTX manufactured the railcar transom in Michigan, and Norfolk Southern repaired the transom in Ohio. The product in this case, the railcar transom, was used in Arizona but also was utilized in many other states, given the ubiquitous nature of a railroad. This factor therefore does not favor any state in particular; instead, it invokes any state in which BNSF operated a railcar, including Arizona.

We consider those factors alongside the general principles of section 6, including uniformity of result, relevant policies of the forum, and ease in the determination and application of the law to be used. See Restatement (Second) of Conflict of Laws §6, at 10 (1971). NACO contends that with all other factors being neutral, Illinois's interest in the litigation is superior to that of Arizona, the random site of the derailment. The relationship between BNSF and NACO centers upon

BNSF's operation of its railcars, which were designed by NACO, on rails that are owned and maintained by BNSF. The damage at issue arose when BNSF operated that equipment in Arizona. Arizona has an interest in applying its product liability laws to an accident that took place within its borders. Illinois's interest in this litigation is not greater than that of Arizona and is not sufficient to displace the presumption that Arizona law should apply. Accordingly, the trial court correctly applied Arizona law to the underlying claims.

### B. Application of *Depecage* Doctrine to Contribution Issue

We now turn to NACO's contention that, even with the application of Arizona product liability law to the merits of this case, the trial court's original ruling that Illinois law should apply to the setoff issue should have been honored. After the trial court observed Arizona law in deciding BNSF's claims, the court ruled that it would not apply a setoff, in keeping with Arizona law of several liability. As a result, NACO was liable for the entire $4.4 million verdict against it, with no setoff reflecting the $5.2 million settlement. Therefore, at issue is whether the court could have applied the substantive law of one state (Arizona) together with the contribution statute of another state (Illinois).

The issue of contribution between tortfeasors in a product liability action is subject to the same choice-of-law rules that apply to an underlying substantive issue. *Mulcahy v. Harris Corp.*, 487 F. Supp. 499, 501 (N.D. Ill. 1980). See also American Law of Product Liability §46.44 (3d ed. 1998) ("the jurisdiction whose law governs issues of liability of a manufacturer *** is not necessarily the jurisdiction that has the most significant interest in application of its law to issues of contribution and indemnification" between the manufacturer and others).

■ NACO contends that even though the trial court applied Arizona law to the merits of this case, the court could have adhered to its prior order and applied Illinois law to the contribution issue under the legal theory of *depecage*. *Depecage* is "the process of applying rules of different states on the basis of the precise issue involved." *In re Air Crash Disaster Near Chicago*, 644 F.2d at 611. The doctrine of *depecage* involves the separation of issues and the application of a distinct choice-of-law analysis to each issue. *Townsend*, 227 Ill. 2d at 161, 879 N.E.2d at 901-02. We have concluded that Arizona law was correctly applied to the substantive claims in this case during the trial.

■ In Illinois, a plaintiff's release of one codefendant reduces the amount of recovery against the nonsettling defendants by the actual amount of any settlement (740 ILCS 100/2(c) (West 2002)), as il-

lustrated by the court's pretrial ruling in this case that, under Illinois law, the court would reduce any eventual recovery by BNSF by the $5.2 million settlement of TTX and Norfolk Southern. In contrast, Arizona has adopted the doctrine of several liability, where each tortfeasor pays damages that reflect its percentage of fault, regardless of what amounts are allocated to other tortfeasors and any settlements by those other parties. Ariz. Rev. Stat. §12—2506 (LexisNexis 2004).

"[T]he question of contribution between joint tortfeasors is determined by the local law of the state of conduct and injury." Restatement (Second) of Conflict of Laws §173, at 515 (1971). Here, the parties' conduct took place in various states, including Illinois, and the accident occurred in Arizona.

NACO maintains that the September 7, 2005, order represented the law of the case and reflected BNSF's agreement to the application of the Illinois Contribution Act, under which NACO was entitled to a $5.2 million setoff reflecting the settlement with TTX and Norfolk Southern. NACO invokes the "law of the case" doctrine, asserting that the court's order remained valid because it contained language by which BNSF could have appealed the ruling pursuant to Illinois Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)). NACO cites to, *inter alia, Liccardi v. Stolt Terminals, Inc.*, 178 Ill. 2d 540, 547, 687 N.E.2d 968, 972 (1997), which held that the failure of a party to challenge a legal decision when it has the opportunity to do so renders that decision the law of the case for future stages of that litigation.

BNSF contends that the trial court was free to apply Arizona law to the setoff issue after applying that state's law to the merits of the case. While BNSF acknowledges that it did not appeal the September 7, 2005, order, it argues that the trial court's ruling that Illinois contribution law would apply was an advisory opinion because the court had not been formally asked to decide that issue and that the setoff issue was not ripe because no judgment had been entered against NACO.

■ The theory of *depecage* allows a court to apply the laws of different states to various issues. We conclude that the parties were bound by the trial court's order of September 7, 2005. That order was made appealable by the inclusion of language from Rule 304(a) that "there [was] no just reason to delay enforcement of an appeal from this order." See 155 Ill. 2d R. 304(a). Because no appeal was taken from that order, it became a final order of the trial court which must be given effect. Therefore, pursuant to the September 7, 2005, order, Illinois law governed the setoff issue even though the trial court, at BNSF's urging, applied Arizona law to the substance of the claims at trial. This setoff operates as a matter of law under the Illinois

Contribution Act. 740 ILCS 100/2(c) (West 2002); see also *Cianci v. Safeco Insurance Co. of Illinois*, 356 Ill. App. 3d 767, 780, 826 N.E.2d 548, 560 (2005) (noting the Act creates a statutory "right of contribution").

Moreover, BNSF specifically knew of the setoff because the trial court expressly stated in the September 7, 2005, order that the settlement between BNSF and defendants TTX and Norfolk Southern was made in good fath and that NACO was entitled to a setoff in the amount of $5.2 million. Again, we must give effect to that order. Accordingly, NACO should receive a $5.2 million setoff against the $4.4 million verdict against it, thus nullifying the judgment against NACO in full.

## II. NACO's Challenges to the Evidence

NACO, while prevailing on the setoff issue, also raises several arguments pertaining to the evidence presented at trial. We deem it necessary to discuss these issues because a jury verdict was entered that established liability on the part of NACO, despite the application of a setoff to the jury's award.

■ NACO's overall contention is that its motion for judgment notwithstanding the verdict (judgment *n.o.v.*) should have been granted because the evidence did not establish that the transom broke before the train derailed or that the transom caused the derailment. NACO asserts that the evidence did not support a verdict of 50% liability on the strict liability count and 53% liability on the negligence count. NACO further argues that no competent evidence was presented that the transom failed because of excessive stress on the equipment. In considering NACO's assertions, we rely upon Arizona law on substantive matters and refer to Illinois law on procedural issues. See *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 351, 770 N.E.2d 177, 194 (2002); *In re Estate of Cuneo*, 334 Ill. App. 3d 594, 597, 780 N.E.2d 325, 327 (2002) (in cases involving conflicts of law, procedural matters are governed by law of the forum).

A motion for judgment *n.o.v.* should be granted only when all of the evidence so overwhelmingly favors the moving party that no contrary verdict could ever stand based on that evidence. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967); *Heupel v. Jenkins*, 379 Ill. App. 3d 893, 898, 884 N.E.2d 1263, 1267 (2008). In ruling on a motion for judgment *n.o.v.*, a court does not weigh the evidence or consider the credibility of witnesses; rather, it only considers the evidence and any inferences therefrom in the light most favorable to the nonmoving party. A court's decision on such a motion is reviewed *de novo*. See *Heupel*, 379 Ill. App. 3d at 898,

884 N.E.2d at 1267, citing *Maple v. Gustafson*, 151 Ill. 2d 445, 603 N.E.2d 508 (1992). In the alternative, NACO contends that its motion for a new trial should have been granted. A ruling on a motion for a new trial should be disturbed if it constitutes an abuse of the trial court's discretion, and a trial court abuses its discretion only when it upholds a verdict that is contrary to the manifest weight of the evidence. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178-79, 854 N.E.2d 635, 652-53 (2006). We consider NACO's arguments under the *de novo* standard.

### A. Expert Testimony

We first consider NACO's challenges to the testimony of witnesses for BNSF. NACO unsuccessfully moved *in limine* to bar the testimony of several witnesses, asserting that their opinions were unsubstantiated conclusions. On appeal, NACO argues that no scientific basis existed to support the testimony of Foster Peterson, an expert witness for BNSF, and Glen Bowen, a BNSF employee who examined the derailment site.

Expert testimony is admissible if the proffered witness is qualified as an expert by knowledge, skill, expertise, training or education and if the testimony will assist the trier of fact in understanding the evidence. *Doe v. Chand*, 335 Ill. App. 3d 809, 820, 781 N.E.2d 340, 350 (2002). NACO did not object to either person's qualifications to testify as an expert. Instead, NACO contends on appeal that Peterson lacked an "objective scientific basis" for his testimony that a broken transom could fall below the rail and cause the train to derail. NACO further points to Bowen's statement that his opinions were not supported by any scientific data.

Peterson testified that he operates a company called Full Service Railroad Consulting that provides "consulting services to the railroad industry relating to the operating, mechanical and engineering disciplines." He has investigated and analyzed more than 200 derailments since 1995. Peterson opined that the derailment occurred when the transom of railroad car ETTX 905266, the first car that derailed, struck a curve in the rail. Peterson stated that the transom broke and dropped below the top of the rail. Peterson studied aerial photos of the derailment and viewed pieces of equipment and railcar parts that were recovered from the site.

Similarly, Bowen's testimony included his opinion that a piece of transom broke off and caused the derailment because a fragment of fabricated transom was recovered adjacent to the last derailed car. Bowen stated that markings on the rails further supported his conclusion that dragging equipment caused the derailment.

■ NACO points out, however, that both Peterson and Bowen admitted that tests had not demonstrated that a broken transom could fall below the rail on which a fully loaded railcar is traveling. NACO argues that the opinion of an expert witness must be supported by reasoned scientific analysis. NACO emphasizes that tests of a loaded railcar and a broken transom did not establish that the transom could fall below the rail. However, NACO does not direct us to a case to support its assertion that BNSF was required to conduct and/or provide results of testing demonstrating the "dragging transom" theory of the derailment. An expert's opinion as to the cause of an occurrence is not improper or inadmissible merely because it is couched in terms of probabilities or possibilities that are based upon certain assumed facts. *Damron v. Micor Distributing, Ltd.*, 276 Ill. App. 3d 901, 911, 658 N.E.2d 1318, 1325 (1995). Therefore, the expert testimony of Peterson and Bowen on their opinion of the cause of the train derailment was properly admitted.

### B. Existence of a Manufacturing or Design Defect

NACO next contends that the evidence did not show that the transom failed due to a design defect. For a *prima facie* case of strict product liability, the plaintiff must demonstrate that the product was in a defective condition that made it unreasonably dangerous, that the defective condition existed when the product left the defendant's control, and that the defective condition proximately caused the plaintiff's injuries. *Dillon v. Zeneca Corp.*, 202 Ariz. 167, 172, 42 P.3d 598, 603 (App. 2002). A product may be unreasonably dangerous because of a manufacturing defect, a design defect, or an informational defect encompassing the product's instructions and warnings. *Dillon*, 202 Ariz. at 172, 42 P.3d at 603.

■ Here, BNSF's complaint encompasses the former two options: a manufacturing and/or design defect. Because NACO designed the transoms but did not manufacture them and is being held in this case to the status of a manufacturer under Arizona statute, we focus on the elements of a design defect theory. To prevail on a design defect claim, a plaintiff must prove that: (1) the defendant manufactured or sold a product; (2) the product was defective in its design or unreasonably dangerous; (3) the defect existed at the time the product left the defendant's control; (4) the defective condition proximately caused the plaintiff's injury; and (5) the plaintiff suffered damages as a result. *Anderson v. Nissei ASB Machine Co.*, 197 Ariz. 168, 172, 3 P.3d 1088, 1092 (App. 1999). NACO contends that the evidence did not establish that the fabricated transom broke due to a design defect that was in place when the transom left the control of TTX, the manufacturer.

The Supreme Court of Arizona has held that in a product liability case, no specific product defect needs to be shown if the evidence, either direct or circumstantial, allows an inference that the accident was caused by a defect. *Dietz v. Waller*, 141 Ariz. 107, 110-11, 685 P.2d 744, 747-48 (1984). The evidence was sufficient to allow such an inference. BNSF presented the testimony of Tim Smith, an engineer of mechanics and materials for Exponent Failure Analysis Associates, an engineering consulting firm. Smith testified that NACO's fabricated transom design was defective because it was prone to cracking. He stated that NACO's design of a fabricated transom "was inadequate for its intended purpose."

TTX and NACO were aware that the fabricated transoms were failing. Smith reviewed an engineering report sent from NACO to TTX in which NACO recommended the replacement of the fabricated transoms in 1996. Based on the metallurgical work and tests performed on the physical evidence, Smith opined that the repaired transom failed, or broke apart, at the "patched location" and that an area with cracking indicated that the cracking "occurred over a period of time" and was "not instantaneous." He further testified that his examination of the impact marks led him to conclude that the transom broke apart and either struck or was struck by a foreign object.

Smith stated that results of tests performed by NACO indicated cracks occurring in the location where the transom cracked on car ETTX 905266. The report that Smith reviewed indicated a relatively high failure rate in the fabricated transoms and recommended that those transoms be replaced. Smith's opinion was that the fabricated transom design was "inadequate for its intended purpose, based on design, manufacturing and quality control." The record establishes that NACO issued a report in February 1996 stating that the fabricated transoms should be replaced with formed transoms "as soon as practical to avoid a possible rapid increase in the failure rate for the [fabricated] transom." The evidence was sufficient to establish that the transom was defective in design.

NACO further contends that TTX, which manufactured the transoms from NACO's design, did not test the items and, therefore, the transoms could have failed because TTX did not make them in accordance with NACO's design. Essentially, then, NACO raises the question of a manufacturing defect by TTX. NACO also argues that the evidence did not demonstrate that it was more at fault than either TTX, which manufactured the transom, or Norfolk Southern, which welded the transom after it broke. However, as to both the strict liability and the negligence counts, the jury apportioned fault among the parties, including TTX as the manufacturer of the transom. On

the strict liability count, the jury found NACO was 50% at fault, with TTX 45% at fault and Norfolk Southern 5% at fault. On the negligence count, the jury found NACO 53% at fault, TTX 40% at fault, Norfolk Southern 5% at fault and BNSF 2% at fault.

## C. Cause of Derailment

■ NACO further contends that the evidence did not establish that the transom broke and caused the train to derail. Focusing on the testimony of BNSF witnesses Foster Peterson and Glen Bowen, NACO asserts that the evidence did not support the "broken transom" theory.

Bowen, the director of the BNSF chemistry and physical testing laboratory, testified that he previously worked as an engineer for special projects where he worked in failure analysis, or studying the broken parts of railcars to determine better design. Bowen had investigated more than 100 derailments and conducted training seminars on derailment analysis. During his testimony, Bowen discussed a derailment "playbook," or a manual for assessing the cause of a train derailment. He categorized the derailment in this case as caused by abrasive marks or dragging equipment on the rail.

The "culprit car" causing a train derailment is usually one of the first three cars derailed. Bowen determined that in this case, the culprit car was ETTX 905266. The transom of that car was missing from the derailment wreckage. Bowen described photos of the axle of ETTX 905266 and pointed out circular marks where the axle was "rotating against something." Bowen testified that the transom broke before ETTX 905266 left the tracks.

At the derailment site, a 17-inch-long piece of steel was found, according to Bowen, "approximately adjacent to the last car derailed." Bowen identified the piece of steel as part of a transom that had been welded. Two other pieces of the transom were recovered, and the three pieces, when placed together, formed a transom that was almost complete. Bowen testified that, based on his investigation of the derailment site, the transom became caught in the curve closure rail and caused the derailment.

Bowen observed marks between the rails that he attested were caused by dragging equipment. He acknowledged that a detector on the railroad tracks designed to sense dragging equipment and located within six miles of the derailment did not indicate a problem. However, Bowen stated that he had no opinion as to whether the transom broke before or after the train passed the dragging-equipment detector. Bowen said that because the transom of a railcar is not aligned with the top of the rail, it was possible for the transom to have broken and not have set off the detector, which was one inch below the top of the

rail. According to Bowen, a transom could break and hang down three or four inches below the top of the rail without setting off the detector.

Bowen had no opinion as to what caused the transom to break or whether the transom was correctly welded. Bowen testified that TTX performed a test with a fully loaded stationary railcar that demonstrated that a broken transom on such a car would not fall below the top of the rail. When asked if he knew of any scientific testing that showed a broken transom would fall below the rail, Bowen said he had seen tests "representative of normal operation that showed that the transom will drop below the top of the rail." Bowen testified that cleanup of the derailment site had begun when he arrived at the scene.

Michael Nuorala, BNSF's general director of maintenance, testified that he had investigated more than 40 major derailments, meaning those that had interrupted rail traffic for 20 or more hours. The morning after the derailment, Nuorala, accompanied by other personnel, walked along the derailed train from the still-upright front of the train back to the end. Near the side of the last railcar standing upright, Nuorala located what he believed to be and what was later identified as a piece of the broken transom. That was the first piece of railcar component or equipment that Nuorala had found to that point.

Nuorala photographed the scene that morning and did not recall if heavy equipment had arrived at the derailment at that time. Nuorala said the marks on the railroad ties leading up to the point of the derailment were a sign of "some mechanical issue or failure." He also explained markings from a photograph of the "turnout area," where parallel lines of railroad track converge and combine to allow trains to switch from one set of tracks to another. Nuorala described his assessment of the marks and the damage to the railroad ties and other components of the rails. He noted that the scrape marks were shiny, which meant they were recently made. On cross-examination, Nuorala stated that he did not feel "really qualified to say" whether the marks he observed were caused by a transom or by another broken component. Nuorala said he had not conducted or observed any testing of broken transoms to see if a transom would fall below the rail far enough to strike a railroad tie.

NACO argues that the physical evidence was as consistent with another reason for the derailment as it was with the transom causing the derailment. NACO asserts that Peterson's opinion that the transom caused the train to derail is contradicted by Bowen's testimony that the dragging-equipment detector did not indicate a problem. However, Bowen stated that the rails and the transom were aligned in such a way that the transom could fall below the rail without setting off the detector, thus providing a plausible reason why

the dragging-equipment detector did not activate. The physical evidence recovered and the marking observed by Nuorala further support Peterson's opinion. Even applying a *de novo* standard, after considering the evidence pertaining to the derailment investigation in the light most favorable to BNSF, the evidence did not so overwhelmingly favor NACO that the jury's verdict cannot stand.

## D. Welding Repairs by Norfolk Southern

■■ NACO next contends that even if the transom was defective and caused the derailment, Norfolk Southern's welding repairs constituted an intervening act and a "remanufacture" of the transom that broke the chain of causation. NACO argues that Smith's testimony for BNSF established that the welding method of Norfolk Southern caused the transom to fail.

Pursuant to Arizona's product liability law, a defendant can raise as an affirmative defense that an alteration or modification of the product was not "reasonably foreseeable." Ariz. Rev. Stat. §12—683(2) (LexisNexis 2004). "Reasonably foreseeable" is defined as an alteration or modification of the product "that an ordinary and prudent manufacturer should have anticipated." Ariz. Rev. Stat. §12—681(8) (LexisNexis 2004). Whether a modification or alteration of a product is reasonably foreseeable is a question for the trier of fact. *Piper v. Bear Medical Systems, Inc.*, 180 Ariz. 170, 176, 883 P.2d 407, 413 (App. 1993).

NACO argues that it was not foreseeable that the pieces of a completely broken transom would be welded together or that the welding would violate numerous standards of repair. However, the evidence established that both NACO and TTX were aware that welding repairs were being performed on the railcar transoms. Robert Carbary of Norfolk Southern discovered during a May 6, 2001, inspection of car ETTX 905266 that the fabricated transom was almost broken in half. The transom was weld-repaired despite a TTX written advisory not to weld a fabricated transom; Carbary stated he did not know of that directive. Whether the welding repairs were performed in accordance with industry standards and whether Norfolk Southern should be assessed any portion of the fault are reflected in the jury's verdict.

## E. Claim of Spoliation of Evidence

NACO next contends that although BNSF preserved the transom in question as evidence, BNSF did not preserve portions of the railroad track, wheels of the railcar, or other items. NACO asserts that it could not establish an alternative cause of the derailment without physical evidence other than the transom.

In the trial court, NACO alleged that BNSF deliberately destroyed the derailment scene by moving and disposing of key physical evidence,

including the rails, the rail bed, parts of the railcars and the automobiles that the train was carrying when it derailed. BNSF responded with a cross-motion for sanctions, contending that it preserved the transom pieces and arguing that NACO contributed to its complained-of situation by failing to preserve its own photographs of the derailment site.

The doctrine of destruction or spoliation of evidence has been described both as a substantive rule of law, which would require us to follow Arizona law, and as a rule of evidence or procedure, to which we would apply the law of Illinois. See *Belleville Toyota*, 199 Ill. 2d at 351, 770 N.E.2d at 194; see also R. Tucker, *The Flexible Doctrine of Spoliation of Evidence: Cause of Action, Defense, Evidentiary Presumption, and Discovery Sanction*, 27 U. Tol. L. Rev. 67 (1995) (spoliation of evidence can be a defense to recovery, a discovery sanction and an evidentiary presumption). Illinois does not treat spoliation of evidence as an independent claim; similarly, Arizona treats spoliation claims within the realm of existing tort law. See *La Raia v. Superior Court*, 150 Ariz. 118, 121, 722 P.2d 286, 289 (1986). While not directly addressing this choice-of-law question, the parties cite to Illinois precedent on this issue, apparently agreeing that this state's law should apply.

Under Illinois law, spoliation of evidence is a form of negligence, and proof of spoliation requires a showing that the defendant owed the plaintiff a duty to preserve evidence, breached that duty, and thereby proximately caused the plaintiff to be unable to prove the underlying cause of action. *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 194-95, 652 N.E.2d 267, 270 (1995); *Welton v. Ambrose*, 351 Ill. App. 3d 627, 637, 814 N.E.2d 970, 979 (2004). A potential litigant owes a duty to an opposing party "to take reasonable measures to preserve the integrity of relevant and material evidence." *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 121, 692 N.E.2d 286, 290 (1998). A duty extends to particular evidence if a reasonable person should have foreseen that the evidence was material to a potential civil action. *Dardeen v. Kuehling*, 213 Ill. 2d 329, 336, 821 N.E.2d 227, 231 (2004).

The trial court's rulings on evidentiary motions, such as motions *in limine*, are left to the court's discretion and will not be disturbed on review absent an abuse of that discretion. *In re Leona W.*, 228 Ill. 2d 439, 460, 888 N.E.2d 72, 83 (2008). NACO argued in its motion *in limine* that had the evidence been properly preserved, NACO "might have been able to determine an alternative cause conclusively if its experts had been allowed to inspect the artifacts recovered from the scene."

After hearing argument on this issue, the trial court denied NACO's motion *in limine*. The court concluded that during the early stage of the derailment investigation, the parties focused on the transom as the derailment's cause. The trial court noted that each party had access to the derailment site and the chance to preserve items or request their preservation. The trial court further noted that although NACO contended in its motion that it wanted to test certain pieces of evidence, NACO failed to explain what the testing would accomplish. Although the court observed that certain parts of the railcar, such as the wheel and axles, should have been preserved, the court concluded that photographs that were taken of those components were adequate.

For its part, BNSF does not dispute its duty to preserve certain evidence. BNSF contended in the trial court that it met its obligation by preserving the transom pieces and other articles and by photographing various other items. However, NACO argues that BNSF was required to preserve physical evidence including sections of the rails that bore scratches and marks that were the basis of Bowen's and Peterson's testimony. NACO contends that it only must demonstrate that it could have determined an alternate cause of the derailment from the unspoiled site, and NACO asserts that such a determination was not possible because it could not inspect and test the entire railcar and the undisturbed site.

NACO must be able to show that BNSF's loss or destruction of the evidence denied NACO a "reasonable probability" of succeeding on the underlying action. See *Welton*, 351 Ill. App. 3d at 637, 814 N.E.2d at 979; *Cangemi v. Advocate South Suburban Hospital*, 364 Ill. App. 3d 446, 471, 845 N.E.2d 792, 814 (2006) (spoliation action rests on ability to bring underlying claim). NACO argues that this case is comparable to *American Family Insurance Co. v. Village Pontiac-GMC, Inc.*, 223 Ill. App. 3d 624, 585 N.E.2d 1115 (1992), in which evidence from a car suspected as the cause of a house fire was barred as a sanction. The homeowners' insurance investigator believed that the fire started due to certain wiring in the car, which was parked in the garage when the fire occurred, and that some of the wires were removed before the car was destroyed seven months later. *American Family*, 223 Ill. App. 3d at 625-26, 585 N.E.2d at 1117. The appellate court held that the plaintiff insurers and homeowners intentionally allowed the destruction of the car, which was the "most crucial piece of the evidence" in that case, when the vehicle was in the possession of the homeowners' auto insurance company. *American Family*, 223 Ill. App. 3d at 627, 585 N.E.2d at 1118.

In *American Family*, although some wires from the car were preserved, along with photographs of the car and other damaged property, the court noted that the defendant car manufacturer and car dealer "were unable to inspect, as plaintiffs' experts were, the most important evidence because of plaintiffs' actions." *American Family*, 223 Ill. App. 3d at 627, 585 N.E.2d at 1118. The court noted:

"Plaintiffs were the only individuals with first-hand knowledge of the physical evidence which is far more probative under these circumstances in determining whether the vehicle caused the fire than photographs and two wires taken from the trunk area. \*\*\* [D]efendants had no opportunity to inspect the car and, in particular, the location and condition of the area surrounding the wires. While defendants are currently able to observe the pictures and the wires, those observations would be without the benefit of the inspection of the whole car. Defendants would be able to observe only evidence gathered by plaintiffs without reference to the object alleged to have caused the damage." *American Family*, 223 Ill. App. 3d at 627-28, 585 N.E.2d at 1118-19.

■ In contrast to the facts of *American Family*, here, NACO effectively concedes that its representatives were at the derailment site and did not request preservation of the items that they now discuss. On appeal, BNSF points to the trial testimony of NACO's representative, Joe Halford, that he had access to the derailment site during the postaccident investigation, and BNSF asserts that Halford did not request further examination of the rails, railroad ties or railcar ETTX 905266 or request that those items or other particular evidence be preserved.

NACO clearly had the opportunity to investigate and inspect the site and the physical evidence. NACO argues in its reply brief that BNSF cites no authority for its assertion that NACO had to affirmatively request that evidence be preserved. However, for BNSF to be liable for spoliation of evidence under Illinois law, its actions must proximately cause NACO's inability to disprove the underlying cause of action. See *Boyd*, 166 Ill. 2d at 194-95, 652 N.E.2d at 270. NACO does not dispute that Halford, its own representative, was at the site and, furthermore, took photographs for NACO at the site that were later misplaced. The trial court was well within its discretion to deny NACO's motion *in limine*, as NACO's claim for spoliation of evidence would not succeed under Arizona or Illinois law.

### F. Testimony of NACO's Expert

■ We next consider NACO's assertion that the court erred in barring the testimony of its proffered expert, Kenneth Klein. NACO presented Klein to testify to the value of the lading, or the vehicles

that were being transported on the railroad cars and were damaged in the derailment. BNSF questioned Klein's qualifications to testify and also objected to the basis of his testimony, arguing that Klein had never been involved in the cleanup of a train derailment and had no engineering or physics background. NACO responded that Klein was an expert "with regard to damage to automobiles."

In a *voir dire* hearing, Klein stated that he is an ASE-certified master technician in automobile collision repair and is also certified in damage analysis and estimation. Klein performed his damage analysis before the trial court, taking into account the speed of the railcars during the derailment and how the cars derailed. Klein compared photographs of the vehicles damaged in the derailment to photographs of autos that had been damaged in road accidents. Based on his review of photographs of the derailed cars, Klein opined that the damage to the automobiles carried by the train was not caused by the derailment, but was instead caused by the derailment cleanup. Klein further stated that many of the vehicles could have been repaired instead of being "scrapped" by BNSF.

On cross-examination, Klein stated that he had no training in accident reconstruction and had never been involved in the cleanup of a derailment site, although he had evaluated vehicles that had arrived at car dealerships with damage. Klein did not view the cars at the derailment site. Klein admitted that he had no expertise in operating the type of heavy machinery used to clear the derailment site. Klein further stated that he did not know of another person in his industry who had applied his method of damage analysis, that "no guidelines exist" for performing that calculation, and that he sought no peer review of his methodology. The trial court held that Klein could not testify as an expert in the valuation of the lading immediately after the derailment. The court ruled that the methodology that Klein used to support his testimony of the value of the lading after the derailment was not "competent."

NACO now contends that because Klein qualified as an expert and used "conventional means" to conclude that the derailment cleanup caused the damage to the vehicles, his testimony should have been admitted. The trial court has broad discretion in determining whether a witness is qualified to testify as an expert. *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 250 Ill. App. 3d 665, 682, 619 N.E.2d 1321, 1332 (1993).

NACO argues that Klein's methodology was "recognized by the industry" and that "nothing unique or unusual" existed about the analysis. However, Klein's uncontroverted testimony in the *voir dire* hearing plainly defeats those arguments. Klein stated that he was not

aware of others who used his method of damage analysis, and he further testified that guidelines for his manner of evaluation did not exist. Moreover, Klein's expertise in the automobile industry did not extend to the study of train derailments. The trial court did not abuse its discretion in concluding that Klein could not offer expert testimony on the valuation of the lading on the train when the derailment occurred.

## G. Jury Instructions

NACO also argues that the jury was incorrectly instructed in various respects. NACO renews its objections to BNSF's jury instructions 16(b), 23A, 25 and 26. In NACO's posttrial motion, it asserted that under those instructions, the jury was able to find, applying Arizona law, that NACO, as the designer of the transom, was liable for any manufacturing defects created by TTX. This line of argument has been addressed and resolved by our conclusion that the trial court correctly applied Arizona law to the merits of BNSF's complaint and that under the applicable Arizona statute, NACO was held to the status of a manufacturer. Therefore, NACO's contentions that are based upon the application of Illinois law, as opposed to Arizona law, to the substance of the complaint are unavailing.

NACO further argues, however, that regardless of what state's law is applied, portions of the jury instructions were in error because an element of NACO's liability was not included in the separate instruction that described to the jury the burden of proof. NACO claims that the separate "burden of proof" instruction was an incorrect statement of the law because the jury could find NACO liable without having to conclude that the transom was ever in NACO's control.

The pertinent portion of the jury instruction at issue stated:

"Before you can find ABC-NACO at fault on this claim, you must find that ABC-NACO manufactured or sold a product that was defective and unreasonably dangerous at the time it left ABC-NACO's control, and that the defect was a cause of BNSF's damages."

The "burden of proof" instruction stated that BNSF must prove that: (1) NACO was a manufacturer or seller of the fabricated transom; (2) the transom was defective and unreasonably dangerous; and (3) the defect was a proximate cause of BNSF's damages. In arguing this issue before the trial court, NACO contended that the jury could have concluded that the control requirement was "not an element of [BNSF's] burden of proof" and that NACO could be found liable for design flaws caused by TTX. NACO contends that the "burden of proof" instruction did not inform the jury that it must find that a defect existed in the transom when the transom left NACO's control.

Jury instructions should be viewed as a whole, and reversible error occurs only when serious prejudice to the complaining party's right to a fair trial has been proven. *Hudson v. City of Chicago*, 378 Ill. App. 3d 373, 405-06, 881 N.E.2d 430, 457 (2007). A reviewing court will not reverse a case on the basis of an improper instruction unless it is able to conclude that the instruction clearly misled the jury. *Baker v. Hutson*, 333 Ill. App. 3d 486, 498, 775 N.E.2d 631, 642 (2002). NACO does not explain why the jury would disregard the language regarding control expressly stated in the elements instruction or offer any evidence that the jury ignored that directive or was unaware of that element. When read together, the instructions informed the jury of the elements that BNSF had to prove. We conclude that no prejudice to NACO occurred due to the absence of the control language in the "burden of proof" instruction.

In conclusion, as to the group of challenges to the evidence raised by NACO, we conclude that the trial court acted within its discretion in its rulings as to the testimony of witnesses for both BNSF and NACO, as well as NACO's motion *in limine* as to the preservation of certain evidence. We further conclude that the evidence supported the jury's verdict and apportionment of fault. Lastly, we determine that the jury instructions as a whole correctly stated the burden of proof.

### III. NACO's Indemnity Counterclaim Against TTX

■■■ NACO's final assertion on appeal is that the court incorrectly granted TTX's motion for summary judgment on NACO's counterclaim. After NACO was named as a defendant in BNSF's lawsuit, NACO filed a counterclaim against TTX, the manufacturer of the transom, and Norfolk Southern, which repaired the transom. NACO asserted that it was entitled to complete indemnification from TTX because it did not have possession of the transom after TTX manufactured it. NACO contended that any judgment entered against it was "predicated or based upon defects created in the transom manufactured and distributed by" TTX.

TTX moved for summary judgment on the counterclaim, alleging that NACO's request for indemnity should be rejected because NACO was not a blameless party or a mere distributor of the product. A trial court's ruling on a motion for summary judgment is a question of law, which is reviewed *de novo*. *Progressive Premier Insurance Co. v. Cannon*, 382 Ill. App. 3d 526, 528, 889 N.E.2d 790, 793 (2008). The trial court granted TTX's motion, stating in its written order that if NACO was found liable to BNSF, NACO could not indemnify TTX but was "not precluded from seeking contribution from TTX for [TTX's] proportional share of liability," referring to the Illinois practice of contribution among tortfeasors.

TTX contends that the trial court correctly granted summary judgment because implied indemnity is no longer recognized in tort cases in Illinois. While NACO correctly responds that implied indemnity is still recognized in Illinois in certain circumstances, NACO concedes that a party that is found negligent cannot indemnify a second party. Indeed, that is the law in both Arizona and Illinois. See *INA Insurance Co. of North America v. Valley Forge Insurance Co.*, 150 Ariz. 248, 255, 722 P.2d 975, 982 (App. 1986) (holding that "an indemnitee must be proven to be free of negligence in order to receive indemnity either under a general indemnity agreement or under implied indemnity"); *Wright v. City of Danville*, 174 Ill. 2d 391, 409, 675 N.E.2d 110, 119 (1996) (when two tortfeasors have breached a duty, the passively negligent tortfeasor can attempt to shift liability to the actively negligent party).

Here, NACO admits that the jury found it to be negligent and, in fact, determined that NACO was the most negligent party.[1] NACO's further arguments on this point presuppose relief that we have not awarded, such as reversal of the judgment or a new trial. Therefore, we affirm the trial court's granting of summary judgment to TTX as to NACO's counterclaim.

### IV. Issues Raised in BNSF's Surreply Brief

■ On a final note, BNSF contends in surreply that a jury instruction issue raised in NACO's reply brief was not included in NACO's opening brief to this court. Points not raised in a brief are waived and cannot be argued for the first time in a reply brief, pursuant to Illinois Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)). NACO therefore has waived this argument. Even had NACO raised the jury instruction issue in its opening brief, the argument rests on NACO's assertion that Illinois law should have been applied to BNSF's substantive claims, which is a contention that we have discussed at length and rejected.

### CONCLUSION

Accordingly, for all of the reasons stated herein, NACO is entitled to a setoff of $5.2 million against the jury verdict against it, thus negating the $4.4 million judgment against it. The judgments of the trial court are otherwise affirmed, as is the court's order granting summary judgment to TTX on NACO's counterclaim.

Affirmed.

O'BRIEN, P.J., and NEVILLE, J., concur.

---

[1] On the negligence count, the jury found NACO 53% at fault, TTX 40% at fault, Norfolk Southern 5% at fault and BNSF 2% at fault.