2025 IL App (1st) 221442-U

SECOND DIVISION
July 29, 2025

Nos. 1-22-1442 & 1-22-1515 (cons.)

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| JOSEPH MITCHELL, individually and derivatively on behalf of APPLIED BEHAVIORAL INTERVENTIONS, LLC, | ) ) ) ) | |
| Plaintiff-Appellant / Cross-Appellee, | ) ) ) | Appeal from the Circuit Court of Cook County |
| v. | ) ) | 15 CH 18076 |
| APPLIED BEHAVIORAL INTERVENTIONS, LLC, MEGAN JAMES, DINO JAMES, and HAND OVER HAND BEHAVIORAL CONSULTANTS, LLC | ) ) ) ) ) | Honorable Sophia H. Hall, Claire J. Quish, |
| Defendants | ) ) | Judges Presiding |
| (Megan James, Defendant-Appellee / Cross-Appellant). | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Van Tine and Justice McBride concur in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Verified second amended complaint was properly filed. Court did not err in defaulting defendant for failing to file verified answer. Judgment after trial on damages was supported by evidence.

¶ 2    Plaintiff Joseph Mitchell filed suit against his business partner, defendant Megan James, claiming she breached her fiduciary duties to their joint company, Applied Behavioral Interventions, LLC (ABI). After a trial on damages only, neither party was happy with the court's judgment. Both appeal the judgment in Joseph's favor. We find no error and affirm.

¶ 3                                    BACKGROUND

¶ 4        Joseph formed ABI in 2012 to provide BCBA (Board Certified Behavior Analyst)

services to children with autism. In Spring 2014, Megan joined the company as a 50% member

alongside Joseph. Under the newly executed Operating Agreement, Megan also served as the

sole manager of the manager-managed LLC. But this partnership would not endure. Within

about a year, it became clear that the relationship between the two had already broken down.

¶ 5        In September 2015, the conflict came to a head. Joseph "left" the business. At trial, the

parties had two very different interpretations of what Joseph "leaving" the business meant.

Joseph would explain that he intended to merely step back from involvement in the operations

but *never* intended to give up his ownership or close the company. Megan, on the other hand,

believed that Joseph wanted out completely and that their partnership would dissolve.

¶ 6        That same month, September 2015, Megan filed a complaint seeking dissolution of ABI

and a restraining order against Joseph. Megan's complaint is *not* the subject of this appeal; the

record is not entirely clear as to how it resolved.

¶ 7        But we do know that in December 2015, Joseph filed a verified complaint alleging that

Megan had breached her fiduciary duties to the company in several ways, most notably by

misappropriating ABI assets and improperly managing the company. While litigating this initial

complaint, Joseph learned that Megan had started a different company, Hand Over Hand

Behavioral, LLC (HOH), in May 2015.

¶ 8        So on November 23, 2016, Joseph filed a "Motion for Leave to File Second Amended

Verified Complaint." That motion requested that Joseph be allowed to amend his complaint to a

add allegations that Megan "established HOH for the purpose of transferring [ABI's] clients to

HOH to freeze out [Joseph]" and add HOH to the lawsuit. Attached to the motion was Joseph's

proposed "Verified Second Amended Complaint." But the proposed complaint suffered from a few issues; the record later suggests that due to a filing error, the exhibits and verification page were not attached. Megan challenged the motion to amend, and, on November 30, the court entered a briefing schedule on the motion. Megan's response did not note the technical defects in the proposed pleading and instead argued that HOH simply shouldn't be a party to the case.

¶ 9     On January 5, 2017, after briefing, the court ordered that "Plaintiffs' motion for Leave to File is granted and Plaintiffs shall file their amended pleading on or by January 6, 2017." The next day, January 6, Joseph filed a "Verified Second Amended Complaint," this time with exhibits and signed verification.

¶ 10    The court ordered Megan to answer or otherwise plead by May. On May 3, 2017, Megan filed an answer and counterclaim. But neither pleading was verified, in violation of the Code of Civil Procedure. See 735 ILCS 5/2-605(a) (West 2022) ("If any pleading is so verified, every subsequent pleading must also be verified, unless verification is excused by the court.").

¶ 11    It does not appear that Megan's lack of verification was an issue—at first. But on February 16, 2018, as the trial approached, Joseph moved for a default judgment on the pleadings due to Megan's failure to verify her answer. On February 20, the court entered an order concluding that "[Megan's] Answer and counter claim are a nullity and are stricken for the reasons stated on the record."

¶ 12    As of February 23, the case was only weeks from trial, but Megan did not have an answer on file, despite the complaint having been filed more than a year earlier. To complicate things further, Megan's attorney withdrew, as it was expected that he would be called as a witness—he was the attorney for Megan and her business outside the litigation. Megan's new counsel

appeared and filed a motion to dismiss the complaint, a motion for summary judgment, and a motion for sanctions against Joseph.

¶ 13    On March 6, the day before trial, Joseph filed a renewed motion for default judgment. The same day, the court heard arguments on the issues surrounding the pleadings. After argument, the court first struck Megan's motion to dismiss, as it was "totally untimely considering these matters could have been brought up [a] long time ago before the eve of trial."

¶ 14    As to default, Megan's counsel, for the first time, orally requested that the court "vacate all technical defaults and allow [Megan] to simply file, she has filed an answer, to verify her answer and file that instanter." After further argument, the "Court denie[d] the oral motion to file a verified pleading on the day of trial" and "grant[ed] the renewed motion for default order."

¶ 15    The court entered default judgment on liability only, leaving for trial only the issue of damages. Joseph argued that Megan could not participate in the trial. But the court allowed Megan to cross-examine Joseph's witnesses and present substantive evidence of her own.

¶ 16    In support of his prove-up, Joseph presented the testimony of Michael LoGiuidice, a forensic accountant. Using a "but-for" analysis, LoGiuidice concluded that ABI was entitled to approximately $2.2 million in damages ($2.9 million with interest).

¶ 17    This calculation rested on the assumption that, absent Megan's breach of fiduciary duty, HOH would not have existed as a competitor to ABI, and that *all* of HOH's business from September 2015 to trial would have otherwise been ABI's business. Essentially, his damage opinion was calculated by taking HOH's revenue over the last several years and attributing it to what ABI would have made. As to Joseph specifically, as he was a 50% owner of ABI, LoGiuidice acknowledged that he would only be entitled to 50% of that lost revenue— approximately $1.5 million.

¶ 18     Megan, on the other hand, sought to undermine these assumptions. She testified that when Joseph "left" the company in September 2015, she believed that it was supposed to be the end of ABI. She introduced evidence—much of it text messages—that Joseph left the company because he intended to "retire" from the field altogether. She took this to mean, as manager, that it was her responsibility to wrap up and dissolve the company. She testified that she immediately went about doing just that. By the end of September 2015, Megan had reached out to ABI's clients to let them know that Joseph had left the company. She also explained to them that they would need to find other providers now that ABI was shutting its doors.

¶ 19     Joseph also testified about the events in September 2015. He explained that he left ABI in September 2015, but he did not do so willingly. His interpretation of the events was that Megan (and her partner Dino) had essentially forced him out of his own company. He acknowledged that he told Megan he intended to "retire" and "seriously was" considering that at the time, but he never intended for ABI to close. Yet, he also acknowledged that he started a new company, ABC, which performs the *exact* same services as ABI, on September 23, 2015—just weeks after he left ABI. He went on to explain that he "just wanted to get out of there, collect the pieces of [his] career, put them back together again in a year and move on."

¶ 20     From September 2015 to approximately September 2016, ABI did not take on new clients and promptly set in motion the process of transferring those clients to other providers—one of them being HOH. The only reason that ABI continued conducting business for the next year was that three clients had difficulties finding replacement service within their insurance network. By September 2016—a year after Joseph left—the company had become dormant. Since then, it has provided no services and has no employees; its only revenue has been from delayed insurance payments. ABI is still an LLC owned equally by Joseph and Megan.

¶ 21　　The other testimony at trial primarily consisted of the parties bickering back and forth about several withdrawals made from ABI's PNC Bank accounts. Joseph presented evidence of what Megan had taken from the accounts; Megan testified about what Joseph had taken.

¶ 22　　Ultimately, the court entered an order awarding Joseph "the entire amount of the $338,51.54 misappropriated." The court found that in or around September 2015, first Joseph and then Megan set up their own new businesses while Megan wound down ABI. The court was persuaded that the parties' intent was to wind down and close ABI's operations. That conclusion led the court to reject Joseph's claim for ABI's lost business, as Joseph "failed to prove to a reasonable degree of certainty that the business of ABI was intended to be ongoing."

¶ 23　　But the court agreed with Joseph that Megan breached her fiduciary duty to him and misappropriated ABI's funds by not giving him half, which he was rightfully due as a fifty-percent member of ABI. The court listed several withdrawals Megan had taken from ABI's bank accounts, many of which were misappropriations but some of which were not. For example, the court excused a withdrawal by Megan of $100,000 because Joseph, himself, had taken a $100,000 withdrawal before he left the company.

¶ 24　　In total, the court concluded that "based on the testimony and evidence, this Court finds that Megan violated her fiduciary duties in winding down ABI by misappropriating $140,000 in monthly draws, and $198,571.54 withdrawn in 2018, for a total of $338,571.54. One-half of those amounts is due to Joseph for distribution of $169,285.77."

¶ 25　　The court also agreed with Joseph that he was entitled to *Megan's* half of the funds based on the doctrine of equitable forfeiture:

　　"Megan willfully and deliberately breached her fiduciary duty to ABI in her undertaking of the winding down of ABI after the departure of Joseph. The evidence shows through

- 6 -

her testimony that Megan, knowing her responsibility to account to Joseph for his 50% share, withdrew the monies from ABI accounts as she wound down the business and did not account to Joseph for his half."

The court based this finding on the fact that, though "[s]he testified that the reasons she did not pay herself money from ABI was because of her responsibility to pay Joseph," she was then "impeached by the records showing the payments to herself." The court found it appropriate to impose the equitable remedy of forfeiture and awarded Megan's half of the monies she misappropriated to Joseph.

¶ 26    Despite finding willfulness supporting equitable forfeiture, the court declined Joseph's request to impose punitive damages.

¶ 27    Relevant here, Megan later filed an Amended Petition for Rule 137 Sanctions against Joseph. This petition amended and revived a petition that had not been ruled on in March 2018. Her initial motion for sanctions claimed that Joseph's complaint contained knowingly false allegations. Her amended motion sought to default Joseph for responding to her motion for sanctions without a verification.

¶ 28    A new judge took over the matter and denied her motions for sanctions. The court found that Megan failed to meet her burden of showing that the allegations in Joseph's complaint were knowingly false. In the court's words, Rule 137 sanctions are "not to penalize litigants and their attorneys simply because they were zealous but unsuccessful." And because a response to a Rule 137 motion was not a "pleading," it was not required to be verified. The court made clear in its order that it was "disposing of all claims, all parties, and all issues raised in the 15 CH 18076 case"—Joseph's case.

¶ 29    Joseph timely appealed from the court's judgment; Megan timely cross-appealed the judgment and the denial of several of her motions. We consolidated the appeals.

¶ 30                                    ANALYSIS

¶ 31    Before addressing the parties' arguments, we remind the parties that our supreme court rules require an appellant's brief to contain coherent arguments with citations to relevant authority. Ill. S. Ct. R. 341(h)(7); see also *Vernon Hills III Ltd. Partnership v. St. Paul Fire and Marine Insurance Co.*, 287 Ill. App. 3d 303, 311 (1997) ("A reviewing court is entitled to have issues clearly defined with pertinent authority cited and coherent arguments presented.") Any argument inadequately presented may be forfeited. *Vernon Hills*, 287 Ill. App. 3d at 311. A party cannot avoid forfeiture by citing irrelevant cases. *Id*.

¶ 32    Megan has filed over a hundred pages of briefing that often overlaps arguments, contains excessive repetition, and at times is difficult to follow. We have endeavored to wade through and address every issue, though we confess that at times it was a challenge. To the extent we missed an argument, it was due to a lack of development and is forfeited under Rule 341(h)(7).

¶ 33    As we mentioned at the outset, this case involves consolidated appeals by both Joseph and Megan. As there is significant overlap and interaction between the arguments raised by each party, we will not separate our discussion into the distinct appeals. Instead, we address the appeals jointly and discuss the issues in the order most easily understood.

¶ 34                                 I. Default Judgment

¶ 35    We begin with Megan's challenge to the court's judgment holding her in default. Spread across multiple arguments, Megan identifies three errors. First, Joseph's Second Amended Verified Complaint was a "nullity" because it was filed without leave. Second, because (in her view) that complaint was filed without leave, it was error to default Megan for not filing a

verified answer. Finally, the default judgment was erroneous, as Joseph's complaint failed to state a claim that she breached her fiduciary duties.

¶ 36    Megan correctly notes that parties must obtain leave of court to amend their complaint, and any complaint "filed without leave of court is a nullity." *Pestka v. Town of Fort Sheridan Co., L.L.C.*, 371 Ill. App. 3d 286, 296-97 (2007). But her argument that Joseph failed to obtain leave is so clearly wrong as to border on frivolous.

¶ 37    The record shows that on November 23, 2016, Joseph sought leave to file a "Second Amended Verified Complaint." That motion included the proposed amended *verified* complaint. True, it did not include the exhibits or verification. (Counsel would later explain that this was inadvertent.) When the motion was presented to the court, Megan's counsel objected, arguing it failed to state a claim. On January 5, 2017, the court ordered: "Plaintiffs' Motion for Leave to File is granted and Plaintiffs shall file their *amended pleading* on or by January 6, 2017."

¶ 38    Megan argues that the court's order only allowed an amended pleading, not a *verified* amended pleading. Thus, she says, Joseph's *Verified* Second Amended Complaint was filed without leave. It is hard to take this argument seriously. The document attached to Joseph's motion purported to be a *verified* complaint—albeit an incomplete one. The court clearly granted *that* motion. The fact that the court gave Joseph *one day* to file the amended pleading is entirely consistent with counsel's explanation that the proposed complaint was ready to go but was missing the exhibits and verification. All signs point to the conclusion that, not only did the court explicitly authorize an amended pleading, but it authorized one based on the request to file an amended *verified* pleading. Megan's argument to the contrary is without merit.

¶ 39    Megan next argues that the court's decision to hold her in default was error. When a pleading has been verified, every subsequent pleading must be verified. 735 ILCS 5/2-605(a)

(West 2022). If a subsequent pleading is *not* verified, the court must treat it as though it had never been filed. *Marren Builders, Inc. v. Lampert*, 307 Ill. App. 3d 937, 942 (1999). When a defendant has failed to plead, the court may enter a judgment by default. 735 ILCS 5/2-1301(d) (West 2022). Once the court has entered default judgment, the decision to set aside that default lies with the court's discretion. *Id*. § 2-1301(e); *Marren*, 307 Ill. App. 3d at 941.

¶ 40    Megan argues primarily that Joseph's complaint did not adequately allege a claim against her. But Megan had an opportunity to challenge the sufficiency of Joseph's complaint during the pleading period by moving to dismiss it. She never did; she filed an *answer*. True, it was a nullity, as it lacked a verification, but it was the furthest thing from indicating that the complaint failed to state a claim and was subject to dismissal. See *Fox v. Heimann*, 375 Ill. App. 3d 35, 41 (2007) (answer generally operates as waiver of argument that pleading fails to state claim). Megan waited until the eve of trial to raise any serious challenge to the complaint's sufficiency; the court was well within its discretion to deny her midnight-hour bid.

¶ 41    Nor, for over a year after Joseph's complaint had been filed, did Megan file a proper verified answer to the complaint, even though Joseph repeatedly brought this problem to the court's attention. From what we can tell, it was not until the day before trial that Megan's new counsel made an oral motion to verify her complaint. By that point, the court had had enough.

¶ 42    We have upheld default judgments even when the party has actively participated in the case. In *Wilkin Insulation Co. v. Holtz*, 186 Ill. App. 3d 151, 153-54 (1989), the circuit court entered default judgment against a defendant after a variety of delay tactics, including filing an unsigned, unverified answer to a complaint. In discussing the propriety of that decision, the court recognized that entering default judgment must be done with an eye toward doing substantial justice between the parties. *Id* at 155. The court must consider the defendant's interests in

defending a case and the plaintiff's right to have its grievances heard. *Id*. The court's decision should not be disturbed absent a "clear abuse of discretion." *Id.* at 156.

¶ 43    While we recognize that the defendant in *Wilkins* was more dilatory than Megan, we cannot say that the court abused its discretion here. Megan has offered no legitimate reason why she believed she should not have to verify her answer. And though Joseph did not immediately move to strike that pleading, he brought the lack of a verification to the court's attention more than once, giving Megan ample time to correct the problem. Instead, she waited until the day before trial. The court was within its discretion to default Megan on the question of liability.

¶ 44    We will add one final note that will become clearer later in this Order. Though the court defaulted Megan on liability, the court not only allowed Megan to participate in the trial on damages but clearly required Joseph to prove the elements of his case. As we will see, the court denied Joseph two entire categories of damages (lost profits and punitives) because Joseph did not prove his case. And the court, to its credit, entered a memorandum opinion of over 20 pages explaining fully its reasoning. Default or not, Megan received a full hearing from the judge; this was no garden-variety "prove-up."

¶ 45                                    II. Rules 103 and 105

¶ 46    After her opening brief was filed, Megan asked for leave to raise an issue of personal jurisdiction pertaining to Illinois Supreme Court Rule 105 (eff. Jan. 1, 2018) in a supplemental brief. As challenges to personal jurisdiction may be raised at any time (*People v. Thompson*, 2015 IL 118151, ¶ 32), we granted her leave with the proviso that Joseph could raise any forfeiture issues, depending on the content of Megan's brief. It was our expectation that Megan would combine her supplemental brief with her reply brief; we said as much in our order. For various reasons internal to our clerk's office, most particularly the length of the filing, Megan

was unable to file the combined brief. So on her motion, we allowed her to file the documents separately—a supplemental brief and a reply brief.

¶ 47    The supplemental brief, as promised, contained the new Rule 105 argument, which we will address below, given that forfeiture rules do not apply.

¶ 48    But the supplemental brief, all of 47 pages, included far more than a Rule 105 argument. It included replies to Joseph's response brief; additional arguments concerning another of her points related to Rule 103(b); and in some instance new points of error not previously raised.

¶ 49    We will not consider anything beyond the Rule 105 argument in the supplemental brief. Per Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), a party may not raise new points of error after the opening brief. See *Burlington Northern & Santa Fe Railway Co. v. ABC-NACO*, 389 Ill. App. 3d 691, 717 (2009). And Megan had a reply brief to buttress the arguments she previously raised in her opening brief and to address arguments made by Joseph in his Response brief. She filed a reply brief, which is limited to 20 pages. See Ill. S. Ct. R. 341(b) (eff. Oct. 1, 2020). She cannot use a supplemental brief, intended only for the new personal-jurisdiction argument, to give herself an endless extension of pages. Allowing her to do so would be unfair to opposing counsel and would make a mockery of the well-settled rules.

¶ 50                                      A. Rule 103(b)

¶ 51    Megan's Rule 103(b) argument was raised in the opening brief, so we will consider it on the merits. Illinois Supreme Court Rule 103(b) (eff. July 1, 2007) allows the court to dismiss a defendant if the plaintiff fails to exercise reasonable diligence in obtaining service. Megan argues that the case against *her* should have been dismissed because Joseph failed to serve the *other* defendants, Dino James and HOH. This argument fails on many levels. We will identify two.

¶ 52    First, Rule 103 provides that if the plaintiff fails to diligently obtain service, the complaint may be dismissed "as to that defendant." Ill. S. Ct. R. 103(b) (eff. July 1, 2007). The committee comments make clear that the rule no longer allows the court to "dismiss an entire action based on a delay in serving some of the defendants if the plaintiff has exercised reasonable diligence with respect to other defendants." *Id*., Committee Comments (rev. May 1997). We agree with the circuit court that the failure to serve other defendants does not help Megan.

¶ 53    Second, even if she *could* invoke Rule 103 under these circumstances, we agree with Joseph and the circuit court that Megan waived the argument. A defendant waives its right to seek dismissal under Rule 103(b) if it does not timely raise the objection. *Ollins v. Karl*, 2022 IL App (1st) 220150, ¶ 27. Megan appeared in the case in March 2016 but did not raise this Rule 103 question until March *2018*, just days before trial, when she sought dismissal under Rule 103. The circuit court was right to charge her with waiver as well.

¶ 54                                     B. Rule 105

¶ 55    Megan next argues that the court's judgment violated Illinois Supreme Court Rule 105 (eff. Jan. 1, 2018). This argument, though raised for the first time in the supplemental brief, "is properly understood as a challenge to the circuit court's personal jurisdiction." *Lamarca v. Che Ce Ce Corporation*, 2019 IL App (1st) 182718, ¶ 15. When the plaintiff obtains a judgment in violation of Rule 105, it renders that judgment void for lack of personal jurisdiction. *Id*. ¶ 13.

¶ 56    Rule 105 governs additional relief against parties in default and requires that when "new or additional relief, whether by amendment, counterclaim, or otherwise, is sought against a party not entitled to notice under Rule 104, notice shall be given him as herein provided." Ill. S. Ct. R. 105(a) (eff. Jan. 1, 2018). The purpose of Rule 105 is to "prevent a litigant from obtaining new or additional relief without giving the defaulted party a renewed opportunity to

appear and defend." *Cook v. Burnette*, 341 Ill. App. 3d 652, 663 (2003). So in cases of default, the court can grant no more than what the complaint's prayer for relief seeks. *Id*. at 662-63.

¶ 57    For example, in *Lamarca*, 2019 IL App (1st) 182718, ¶ 16, cited here by Megan, we found that a monetary judgment against a tenant was impermissible because "Plaintiff's initial complaint only sought possession of the subject property; nowhere in this complaint did he seek a money judgment against defendants."

¶ 58    This is Megan's argument: "The entry of the default motion against Megan required Joseph to file a third amended complaint with notice to Megan as the defaulted defendant in compliance with Rule 105 to allege legally and factually sufficient claims." That is not what the rule provides. As we held in *Lamarca*, Rule 105 merely limits a plaintiff from recovering more than it sought in the complaint, a protection that is particularly important in the context of defaulted parties, where often (though not here) the defaulted party is not even present to defend itself. Megan cites no authority for the proposition that, post-default, Joseph was required to amend his complaint once more to provide yet further notice to her. He would only be required to do so if he sought "new or additional relief."

¶ 59    But Megan claims that Joseph *did* obtain "new" relief at the trial regarding damages that occurred in the "winding down" of ABI. She writes that "[n]owhere in the Second Amended Complaint does Joseph allege Megan violated her fiduciary duties in winding down ABI."

¶ 60    But Joseph's complaint obviously sought damages flowing from Megan's breach of fiduciary duty, which clearly included the windup period. The fact that the circuit court put a finer point on it, detailing her breaches during the windup, does not change that fact; it just meant that, following testimony, the court could more particularly specify what the complaint alleged more generally. Nor can Megan complain that she was somehow surprised by an

approximately $340,000 judgment, as Joseph's complaint sought "judgment against Megan James in an amount in excess of $400,000.00 as compensatory damages."

¶ 61     We thus find no merit to Megan's jurisdictional or service-of-process arguments.

¶ 62                              III. Sufficiency of Damages Award

¶ 63     We now turn to the court's judgment on damages, a ruling that pleased neither party.

¶ 64     For his part, Joseph makes two points. First, he says he should have been awarded damages for lost business. Second, he says, the circuit court should have awarded punitive damages, given that the court found Megan's actions to be willful when it forfeited her half of ABI's remaining income.

¶ 65     Megan on the other hand, defends the court's conclusion that ABI was going to wind down and goes a step further: there was no evidence to support the damages that the court *did* award. Specifically, she argues that there was no evidence that she misappropriated funds at all. And she disagrees with the court's conclusion that she "willfully" misappropriated them.

¶ 66     We review the court's judgment to determine if it is against the manifest weight of the evidence. *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 25. We ask whether "the judgment is arbitrary, unreasonable, not based on evidence, or the opposite conclusion is apparent." *Id*.

¶ 67     And though this was a trial on damages only, following a default judgment, the circuit court was not required to (and did not) entirely accept Joseph's claims hook, line, and sinker. The law is clear that, in the case of default judgment, the court retains the authority to "require proof of the allegations of the pleadings upon which relief is sought." 735 ILCS 5/2-1301(d) (West 2022). Here, the court exercised that authority and allowed the parties a generous berth to

prove and argue their positions. After comparing the court's judgment with the evidence presented, we find the circuit court's conclusions to be fully supported by the record.

¶ 68                                    A. Lost-Business Damages

¶ 69    Joseph's first point is that there was no evidence to support the court's conclusion that the parties intended to wind down ABI. We find more than sufficient evidence. For one, Megan unequivocally testified that this was her intent, based on the conversations she had with Joseph. Joseph also admitted that when he "left" in September 2015, he told Megan that he was going to retire from the field—that he was done. As he put it at trial, Joseph "just wanted to get out of there, collect the pieces of [his] career, put them back together again in a year and move on."

¶ 70    The record further shows that Megan put that belief into action. Within weeks of the parties' split, Megan began informing the staff and clients that ABI was shutting down. While ABI continued servicing clients for approximately a year, Megan testified that it only served those few clients who could not find other providers. So the court had ample reason to conclude that, after the break-up in September 2015, the intent of the parties was to wind down ABI and go their separate ways. That finding was not against the manifest weight of the evidence.

¶ 71    That finding sweeps the legs out from under from Joseph's claim for lost business resulting from Megan's breach of fiduciary duty. At trial, Joseph's expert, LoGiuidice, essentially calculated damages by determining HOH's revenue and simply attributing it to ABI. By his own admission, this opinion is premised on the assumption that *all* the business that HOH conducted would have been performed by ABI instead, absent Megan's misconduct. But if ABI were ceasing operations, as the trial court found, then obviously ABI would not have serviced those customers. The court's refusal to award damages for lost business was supported by the record and was not against the manifest weight of the evidence.

¶ 72                                    B. Misappropriation Damages

¶ 73    We now turn to the damages that the circuit court did award. The award consists of two parts: the amount that Megan misappropriated and the amount that Megan forfeited. We start with misappropriation.

¶ 74    In its written decision, the court, citing specific exhibits at trial, went through each of Megan's 14 withdrawals from ABI's bank account that Joseph claimed were misappropriated. Of these, the court found that Megan's $100,000 withdrawal in September 2015 was not a misappropriation because, when the two members "broke up the business," they *each* took $100,000 out of ABI's account. Her first monthly draw was not a misappropriation, either, as Megan paid both herself and Joseph their $20,000 for September 2015.

¶ 75    The court concluded however, that the other 12 withdrawals *were* misappropriation for Megan's personal benefit. In total, the court concluded that Megan had breached her fiduciary duties in winding down ABI "by misappropriating $140,000 in the monthly draws, and $198,571.54 withdrawn in 2018, for a total of $338,571.54." The court recognized that since Joseph was a 50-percent member, he was only entitled to half that amount.

¶ 76    Megan argues that there was no evidence that these withdrawals constituted misappropriation. But the court explained its reasons. For example, seven of the withdrawals were for monthly draws Megan paid to herself *without* a corresponding payment to Joseph—who, while no longer working at ABI, was still a 50-percent LLC member. Megan also made several withdrawals to pay for *her* legal fees in connection with her litigation with Joseph. And while Megan attempted to explain away the others at trial, there is nothing to suggest that the court thought she provided adequate explanations as to why they were withdrawn.

¶ 77    The crux of the court's decision was that, after September 2015, Megan ran ABI as though Joseph was no longer a member, made withdrawals without regard to Joseph's interest in ABI, and did not account for the fact that he was entitled to 50 percent of the monies in ABI's account. After reviewing the evidence presented at trial, we cannot say that the court's finding of misappropriation is against the manifest weight of the evidence.

¶ 78                                C. Equitable Forfeiture

¶ 79    In addition to giving Joseph his half of the misappropriated amounts, the court concluded that Megan had forfeited her half by "willfully and deliberately breach[ing] her fiduciary duty to ABI in her undertaking of the winding down of ABI after the departure of Joseph." The court found that, despite "knowing [of] her responsibility to account to Joseph for his 50% share," Megan "withdrew the monies from ABI accounts as she wound down the business and did not account to Joseph for his half." In addition, Megan initially denied making any payment to herself but was forced to change course after she was repeatedly impeached with the bank records showing that she had.

¶ 80    "[A] fiduciary is entitled to compensation only if it duly and faithfully performs *all* its duties during the period of breach." (Emphasis added.) *Tully v. McLean*, 409 Ill. App. 3d 659, 681 (2011). So when a court finds that a party willfully breaches its fiduciary duty, a court may forfeit the compensation to which that fiduciary otherwise would have been entitled. *Id*. The purpose of forfeiture is not to make another party whole but to "deprive the wrongdoer of the gains from the breach of duty and to deter disloyalty." Whether to impose forfeiture is within the equitable discretion of the trial court. *Id*.

¶ 81    Megan argues that her actions couldn't have been a willful violation of her fiduciary duties, as she was legally allowed to take the actions she did. For example, her monthly draws

were specifically authorized by ABI's operating agreement and thus could not constitute a willful breach of fiduciary duty. But that misses the point of the circuit court's ruling. The court did not find that Megan's decisions to withdraw money, by itself, were a breach of fiduciary duty; it was the fact that she did not split the withdrawals with her 50-percent partner, Joseph.

¶ 82    There is more than enough evidence that Megan continued operating ABI as though Joseph was no longer a member. Megan tried to justify her actions by arguing that Joseph not only intended to wind down ABI but also voluntarily surrendered his fifty-percent membership interest. The trial court believed that the parties intended to wind down but did *not* believe that Joseph simply gave up his interest in the remaining company assets. Which meant, in the trial court's eyes, that Megan wound down ABI with willful disregard for Joseph's rights, in violation of her fiduciary duties. That finding is not against the manifest weight of the evidence.

¶ 83                                      D. Punitive Damages

¶ 84    Joseph says this finding of willfulness leads to a paradox within the circuit court's decision. As its final ruling on damages, the court found that "the circumstances of the dispute between the parties and the facts in evidence" did not warrant an award of punitive damages. How, Joseph asks, can the court have found willfulness supporting forfeiture but not punitive damages? We review the award (or non-award) of punitive damages for an abuse of discretion. *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 378 (1994).

¶ 85    As noted, the purpose of forfeiture is *not* to punish but to "deprive the wrongdoer of the gains from the breach of duty." *Tully*, 409 Ill. App. 3d at 681. Punitive damages, on the other hand, are meant to punish wrongdoers. *Slovinski v. Elliot*, 237 Ill. 2d 51, 57 (2010). Punitive damages are not favored and should only be awarded where "the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is 'committed with fraud, actual

malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.' " *Id*. (quoting *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978)).

¶ 86　The court easily could have determined that, while Megan's actions were willful, her conduct did not approach the level of moral culpability necessary to warrant punitive damages. The court could have also determined that Megan did not need the additional sting of punitive damages in light of the outcome otherwise, including the forfeiture of her share of ABI proceeds. True, the point of forfeiture is not to punish—neither is the award of compensatory damages— but there is no rule prohibiting the trial court from taking the entire case into context before making the weighty decision to award punitive damages. The court clearly did so and decided that, under all the circumstances present, punitive damages were not appropriate. Joseph has given us no reason to upset that determination. We thus uphold it.

¶ 87　　　　　　　　　　　　IV. Rule 137 Motion

¶ 88　Finally, Megan claims the court erred in denying her Rule 137 motion for sanctions against Joseph. Turning the table on the concept of "verified" pleadings, Megan first argues that the court erred in not holding Joseph in "default" for failing to answer her *verified* motion for sanctions with a *verified* response. But as the trial court ruled, "[a] motion for Rule 137 sanctions is not a pleading" and is not subject to the pleading rules in the Code of Civil Procedure. *In re Marriage of Nesbitt*, 377 Ill. App. 3d 649, 660 (2007).

¶ 89　Megan also claims that Rule 137 sanctions were warranted because of Joseph's "filing of the Second Amended Complaint without leave of court." As already noted, we dispute the premise that he filed that pleading without leave in the first instance. We find no abuse of discretion in the court's denial of Megan's Rule 137 motion.

¶ 90                                    CONCLUSION

¶ 91     The judgment of the circuit court is affirmed.

¶ 92     Affirmed.